FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2002 JUL 12 P 6:56

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

JOHN J. BLOOM

    Plaintiff,

vs.                        CASE NO: 3:02-CV-176-J-16-HTS

WEEKS MARINE, INC.

    Defendant.

_____/

## PLAINTIFF'S EMERGENCY MOTION FOR MAINTENANCE AND CURE

COMES NOW the Plaintiff, John J. Bloom, by and through his undersigned counsel, and pursuant to this court's equitable powers as discussed in *Vaughan v. Atkinson*, 369 U.S. 527, 8 L.Ed.2d 88, 82 S.Ct. (1962), and in the alternative pursuant to 28 U.S.C. Section 2201 and Rule 57, Federal Rules of Civil Procedure, moves this Honorable Court for an Emergency Order Directing the Defendant, Weeks Marine, to provide the Plaintiff with maintenance and cure, and in support thereof would show that:

1.    Seamen are traditionally wards of the court.  This court has equitable authority to order a shipowner to provide for the care of seamen who are injured on the job.  *Vaughan v. Atkinson*, 369 U.S. 527 8L.Ed.2d 88, 82 S.Ct. 997 (1962)("admiralty courts are, indeed, authorized to grant

26

equitable relief.") Motions concerning maintenance and cure
may be heard on an emergency basis.  The standard applied to
motions seeking maintenance and cure is not the summary
judgment standard.  There is a presumption that a seaman is
due to be provided maintenance and cure and unless the
shipowner unequivocally shows that the seaman is not entitled
to it.  *Sefcik v. Ocean Pride Alaska, Inc.*, 844 F.Supp. 1372,
1994 AMC 2192 (D.C. AK 1993).  The shipowner has the burden of
proving that maintenance and cure is not due.  Any ambiguities
are to be resolved in favor of the seaman.  *Kratzer v. Capital
Marine Supply, Inc.*, 490 F.Supp. 222 (M.D. La.1980) *a'ffd* 645
F.2d 477, 1982 AMC 2692 (5th Cir. 1981).

    2.   The Plaintiff was an able bodied seaman aboard the
*M/T Katherine* when on February 7, 2002, he fell over 40 feet
on to a steel deck due to the failure of a safety line
attached to a safety belt which was part of the ship's
equipment.

    3.   As a result of the fall, Mr. Bloom has suffered
severe injuries, including a compression fracture T6-7, torn
ligaments in the right knee (PCL, MCL) requiring surgery,
fractured right humerus requiring surgery to place IM rodding,
left scapula fracture, left mid-shaft fibula fracture,
fractured right fibula, multiple fractured ribs, punctured

lung, left pneumothorax, head lacerations and a herniated disc at L5-S1, etc.  (See Affidavit of John J. Bloom attached hereto as Exhibit "A"). (See medical records attached hereto as Exhibit "B").

4.   As a result of the accident, Mrs. Bloom, purchased two airline tickets at a cost of $638.00 in order to bring her husband from Norfolk, Virginia back down to Jacksonville, Florida.  Furthermore, Mrs. Bloom had to take off 6 days from her job in order to care for Mr. Bloom after this accident. Defendant Weeks Marine has refused to pay for Mrs. Bloom's attendant care of her husband after this accident.  (See letter attached as Exhibit CC).

5.   Because of his injuries, Mr. Bloom has been unable to work since the accident and has required extensive medical treatment.  Since the February 7, 2002 accident, Weeks Marine, Inc. has systematically obstructed and refused to provide reasonable and necessary medical treatment for Mr. Bloom's injuries.  Further, Weeks Marine, Inc. has flatly refused to pay any maintenance to Mr. Bloom (lost wages for the remainder of instant trip upon which the accident occurred, and costs of room and board until MMI) since the date of the accident.

6.   Mr. Bloom lives in Jacksonville, Florida, with his wife and two twin boys, who are 3 years old.

3

7.   On July 3, 2002, Weeks Marine cut off all of Mr. Bloom's medical care.

8.   Defendant's intentional actions in this case since February 7, 2002 -- refusing to pay maintenance ever since the accident (during which time Mr. Bloom has received no income to support his family), systematically delaying and refusing to provide medical care, and now cutting off of all medical care -- have cause significant medical and financial suffering to Mr. Bloom.   Finally, by cutting off all of Mr. Bloom's medical care, Weeks will cause Mr. Bloom to lose the medical progress he has made to date.   This motion follows.

## MAINTENANCE

9.   No maintenance has been paid to Mr. Bloom since the date of the accident, February 7, 2002. Mr. Bloom was only paid one half day's pay for the date of the accident, and he has not made one cent of income since the accident, for over five months. (See John Roberts Report attached hereto as Exhibit C).   Federal law is clear that Weeks has a duty to provide maintenance to Mr. Bloom, a seamen injured while on the job, regardless of fault.

10.   At the time of the accident, Mr. Bloom was making $183.32 per day and he had 13 days left on his tour at the time of the accident, which was scheduled to end on February 20, 2002.   Under the law of maintenance and cure, Weeks is

4

required to pay Mr. Bloom for lost wages incurred from the
time of the accident until the end of the voyage. *Farrell v.
United States*, 336 U.S. 511, 69 S.Ct. 707 (1949). As a result
of the accident, Mr. Bloom lost the $2,383.16 in wages he
would have earned by finishing this trip which Weeks is
obligated to pay. *The Osceola*, 189 U.S. 158, 23 S.Ct. 483
(1903).

    11.   Furthermore, Mr. Bloom is due and owing 23 weeks, or
161 days, worth of past maintenance for costs of room and
board since the accident. *Barnes v. Andover Co.*, 900 F.2d
630, 633 (3d Cir.1990)(Maintenance is a living allowance for a
seaman while he is ashore recovering from injury or illness
and it is not dependant upon fault); Martin J. Norris, *The Law
of Seamen*, 4th Ed. §26. The union contract under which Mr.
Bloom was working provides for $20 per day for maintenance,
which would calculate into $3,220 in past due maintenance for
room and board, plus interest. (Contract Attached as Exhibit
D).

    12.   However, Weeks Marine apparently does not deem
itself bound by the contract as it has refused to pay
maintenance for over five months, and has requested proof of
Mr. Bloom's costs of room and board. (Letter Attached as
Exhibit E); see also *Gheorghita v. Royal Caribbean Cruises,
Ltd.,* 93 F.Supp.2d 1237 (S.D. Fla. 2000). The actual cost for

5

Mr. Bloom's room and board since the accident has been $63.79 per day. (See John Roberts' report attached hereto as Exhibit F). Therefore, Weeks Marine owes Mr. Bloom more than $10,270.19 for past maintenance for room and board, plus interest.

13. Weeks' purported basis for refusing to pay maintenance has been a need to "investigate the accident." However, Weeks has known from day one that Mr. Bloom was injured on the job when the safety belt's rope broke sending him plunging 40 feet to the deck below. (See Accident Report filed by Weeks and the Coast Guard, attached as Exhibit G - Black and white copies of color photographs, attached hereto as Exhibit H). Defendant Weeks Marine has failed to produce actual color photographs of Mr. Bloom on the deck of the boat after his fall and the actual rope that broke causing the fall; and has failed to produce the safety belt/rope itself despite repeated requests for the same.

## HISTORY OF FAILURE TO PROVIDE REASONABLE AND NECESSARY MEDICAL CARE

14. Since the accident, Weeks Marine has repeatedly delayed reasonable and medically necessary treatment from Mr. Bloom. Some of the delays are as follows:

A. Defendant Weeks Marine delayed authorization

of a Neurologist: On April 15, 2002, treatment with a neurologist was requested to treat the head laceration, headaches, and back pain Mr. Bloom was experiencing from the fall. Weeks did not approve this until April 17, 2002, two days later.

B.   Defendant Weeks Marine has delayed authorization of physical therapy: On February 13, 2002, authorization and payment for physical therapy was requested. Weeks delayed authorization until February 19, 2002, a six day delay.  As a result, Mr. Bloom now has developed adhesive capsulitis in his right shoulder from the scar tissue that formed during the delay in providing physical therapy.

C.   Defendant Weeks Marine delayed authorization of the MRI of Mr. Bloom's lumbar spine: On March 13, 2002, based upon ongoing back pain and the compression fracture at TC-7, authorization for a lumbar MRI was requested. Weeks Marine refused to authorize the lumbar MRI for over one week, until March 22, 2002 and only after the filing of an emergency motion to compel.

D.   Defendant Weeks Marine delayed authorization of the Pulmonary consultation. On April 17, 2002, Dr. Lancaster requested that Mr. Bloom be seen by a pulmonologist for his punctured lung and left pneumothorax. Only after the filing of an emergency motion, after a delay of almost one

7

months, Weeks Marine finally approved the pulmonologist referral on May 7, 2002.

**HISTORY OF FAILURE TO PAY for MEDICAL TREATMENT**

15. In the past, Weeks Marine has failed to timely pay for reasonable and medically necessary treatment. The bills that are outstanding are, including but not limited to:

A. **Dr. Steven Lancaster** $7,442.00
Jacksonville Orthopaedic Inst.
Filed with Weeks Marine.
Weeks Marine paid a total of $6,882.39
Amount written off is $195.61
Current outstanding balance is $364.00

B. **Sentara Hospital** $30,298.44
Emergency treatment from February 7, 2002 through February 11, 2002, and charges filed with Weeks Marine.
The account was charged $6,660.00 in late charges due to non-payment of bill by Weeks Marine bringing the grand total due to $36,938.44.
Finally, on April 25, 2002, Weeks Marine paid $33,244.66.
A refund in the amount of $2,966.16 was issued to Weeks Marine on May 11, 2002.

C. **Atlantic Anesthesia** $1,102.00
Filed with Weeks Marine on 2/14/02.
To date, nothing has been paid by Weeks Marine.
The current outstanding balance is $1,102.00

D. **Dr. Benjamin Moore** $600.00
Filed with Weeks Marine on 5/3/02.
To date, Weeks Marine has completely refused to pay Dr. Moore's bills.

E. **HealthSouth** $11,874.00
Weeks Marine paid $6,160.98
Amount written off was $571.25
Total amount due and owing is $5,141.77

F.    **Travel Expenses and Home Care Assistance**

**REFUSAL AND FAILURE TO PROVIDE**
**REASONABLE AND NECESSARY MEDICAL TREATMENT**

16.   Defendant Weeks Marine is required by law to guarantee payment of reasonable and medically necessary treatment. See *Sullivan v. Tropical Tuna, Inc.,* 963 F. Supp. 42 (1997). Following are the requests for authorization that have not been provided to date:

A.    **Herniated Disc at L5-S1**: As outlined above, Defendant unreasonably delayed almost one week before it finally approved a lumbar MRI for evaluation of Mr. Blooms continued back pain.  Finally, on April 10, 2001, the lumbar MRI was done and it revealed the source of Mr. Bloom's continued pain, a herniated disc at L5-S1 with left lateralization and impingement of the nerve root.  (MRI Attached as Exhibit I).  On April 10, 2002, Dr. Lancaster referred Mr. Bloom to Dr. Frank Collier, with the Jacksonville Orthopaedic Institute, stating, **"I have recommended he be seen by Dr. Collier for an epidural steroid injection for his back."**  (Attached as Exhibit J).  Mr. Bloom was given an appointment for April 25, 2002.  On April 16, 2002, this request was immediately forwarded to Weeks for approval. (Exhibit K).  Weeks requested clarification of the request and

9

on April 16, 2002, Plaintiff forwarded an actual copy of the referral from Dr. Lancaster, again requesting approval (Exhibit L), and approval was finally given.  On April 25, 2002, after evaluating Mr. Bloom, Dr. Collier concurred with Dr. Lancaster and prescribed a course of lumbar steroid injections.  (Dr. Collier's <u>April 25, 2002</u> note attached as Exhibit M).  Dr. Benjamin Moore, Mr. Bloom treating neurologist, indicated concurred with this course of treatment. (See Dr. Moore note attached as Exhibit N).

Weeks Marine has continued to refuse approval for the prescribed lumbar injection to this date.  At first, Weeks Marine requested a letter from Dr. Lancaster explaining why the injections were necessary. (Attached as Exhibit O).  On April 30, 2002, Plaintiff responded stating that

> We are in receipt of Weeks Marine's denial of Dr. Collier's prescription for epidural steroid injections to treat Mr. Bloom's herniated disc from the accident .... Weeks Marine is in fact denying Mr. Bloom the prompt medical care that it is obligated to provide.  As you know, Mr. Bloom suffered severe injuries in his 40-foot fall from the top of a mast to the deck below resulting in, among other severe injuries, a fractured spine and severe back pain.  Despite these facts, **Weeks took over two months from the date of the accident to even approve an MRI of Mr. Bloom's back.**  As you know, this MRI showed, in addition to the compression fracture in his mid-back at T6-7, that Mr. Bloom had suffered a herniated disc in his lower back, at L5-S1.
> Today, Weeks Marine is again delaying and obstructing Mr. Bloom's medical care by requesting that the following pointless exercise take place

10

before approving the spinal injections recommended
by Dr. Collier:
(1)   Asking Dr. Collier, a partner of Dr. Lancaster's in
the same practice, to first recommend this treatment to
Dr. Lancaster; then
(2)   Asking that Dr. Lancaster perform the formality of
approving what his own partner, to whom he has already
referred Mr. Bloom for treatment of his back because Dr.
Collier is the back specialist, to agree with the back
specialist to whom he referred Mr. Bloom for treatment of
his back in the first place; and then
(3)   Requiring Dr. Lancaster to, "determine where and by
whom the procedure will be performed" and then write yet
another recommendation for the same treatment that his
partner, the back specialist to whom he sent Mr. Bloom
for this exact care in the first place, has already
recommended.
    I refer you to Dr. Lancaster's letter dated
**April 16, 2002**, wherein Dr. Lancaster made the
initial referral to Dr. Collier stating, **"I am
requesting authorization for eval. & treat. for
epidural steroid injections with Dr. Collier."**
    It is unreasonable for Weeks Marine to ask that
they hear the same thing from Dr. Lancaster again
while Mr. Bloom suffers and waits another couple of
weeks or months.
    We respectfully request that Weeks Marine
immediately approve and provide this reasonable
medical care

Weeks Marine continued to deny the request despite the obvious

reasonable and necessary medical need for the treatment.  On

May 7, 2002, Weeks sent a 3 page accusatory letter attacking

Mr. Bloom, and requesting yet another letter from Dr. Collier

explaining the need for the injections.  (Attached as Exhibit

P).  On May 22, 2002, Plaintiff responded, again requesting

approval.  (Exhibit Q).  On May 28, 2002, Weeks responded,

again refusing approval for the injections, and requesting yet

another letter from Dr. Lancaster explaining the need for the

injections.  (Attached as Exhibit R).  On May 31, 2002,
Plaintiff responded again requesting approval.  (Attached as
Exhibit S).

As of the date of this writing, July 12, 2002, nearly
three months after the initial request was made, Weeks still
has not approved this necessary medical care.  This delay has
caused Mr. Bloom to unnecessarily suffer from the pain caused
by his herniated disc, L5-S1, which is impinging upon the
nerve root.  Dr. Collier, in his letter dated July 10, 2002,
has requested,

> expedited approval and payment of the injection in
> order to prevent any further undue suffering and
> potentially avert a surgical intervention.

(Letter Attached as Exhibit T).  Yet another request for
injections was made on June 5, 2002. (Attached as Exhibit U).
Another request for the injections was made on July 10, 2002.
(Attached as Exhibit V).  Defendant continues to refuse
approval for the same.

B.  **Punctured Lung and Pneumothorax** - Since the
date of the accident, February 7, 2002, Mr. Bloom required
treatment with a pulmonologist for follow-up treatment of his
punctured lung, pnuemothorax, and his chest tube placement.
In addition to the obvious need for this treatment because of
Mr. Bloom's injuries, this care was also requested by Dr.
Lancaster in his notes dated February 25, 2002 and April 10,

12

2002.  (Attached in Exhibit W).  The request for pulmonologist was also requested in Plaintiff's March 21, 2002 Emergency Motion for Maintenance and Cure (Dkt. 5).  The undersigned again requested the care on April 17, 2002.  However, Weeks Marine instructed Dr. Yergin that they would not guarantee payment as required without a proper invoice and medical report.  (Weeks letter attached as Exhibit X). This was in violation of Weeks' duty to guarantee treatment in advance under *Sullivan v. Tropical Tuna, Inc.*, 963 F.Supp. 42 (D.Mass. 1997). Finally, on May 7, 2002, Mr. Bloom seen by a pulmonologist, Dr. Yergin.  However, Weeks Marine still is refusing to pay his bill, now 9 weeks later and is refusing to approve further requested care with Dr. Yergin. (Attached as Exhibit Y).

       C.  **Neurological Treatment** - On March 11, 2002, Dr. Lancaster told Mr. Bloom that he needed to see a neurologist for evaluation and treatment for possible closed head injuries and to check on his dilantin levels.  Mr. Bloom called and tried to schedule the appointment with Dr. Moore, who was Mr. Bloom's treating neurologist from before the accident.  Dr. Moore's office attempted to obtain authorization for the same. On April 11, 2002, Weeks Marine denied authorization for treatment with Dr. Moore stating that Dr. Steven Lancaster had already been authorized as Mr. Bloom's primary care physician.

(Exhibit Z).  On April 17, 2002, authorization for the neurological evaluation was finally obtained, over four weeks after the initial request was made and despite the obvious need for the same.  (Exhibit AA).  However, Weeks continues to refuse to pay Dr. Moore's bill.  Furthermore, on June 3, 2002, due to continuing headaches, dizziness and memory problems, Dr. Lancaster again referred Mr. Bloom to Dr. Moore for further evaluation and treatment for closed head injuries, a neuropsychological evaluation and depression.  (Exhibit BB). To date, Weeks continues to refuse this necessary and reasonable medical care.

D.  **MRI of Right Shoulder** - On June 26, 2002, based upon Mr. Bloom's continued marked limited range of motion, pain and limitations in the right shoulder, Dr. Lancaster prescribed an MRI of Mr. Bloom's right shoulder. (See Attached medical records).  To date, this request has not been authorized.

### CUT-OFF OF CURRENT ONGOING TREATMENT

17.  On July 3, 2002, Defendant, Weeks Marine terminated all cure for Mr. Bloom in an attempt to force Mr. Bloom to undergo a "cure" examination.  The treatment that has been terminated is as follows:

A.  **Physical therapy, Right Shoulder, Right Knee and Lumbar Spine** - If Mr. Bloom does not continue with the

14

prescribed physical therapy on his right shoulder, right knee, and lower back, he will lose all benefits of therapy from the date of the accident to the present.

       B.    **Dr. Steven Lancaster** - Defendant Weeks Marine has terminated all treatment and care for Mr. Bloom's orthopaedic injuries with his primary care physician.

       C.    **Dr. Richard Agnew** - Defendant Weeks Marine has terminated all cure which precludes Mr. Bloom from seeing the thoracic surgeon to evaluate and treat Mr. Bloom for his punctured lung as a result of the fall on February 7, 2002.

## MEMORANDUM OF LAW

Seaman are wards of the court and courts are particularly cognizant of the need to intervene in seaman's cases for humanitarian reasons.  Specifically, Local Admiralty Rule 7.05(1) deals with the issue of humanitarian expenses when, for instance, vessels are under arrest.  It provides that:

> Application for providing food, water, and necessary medical services for the maintenance of the crew may be submitted and decided ex parte by a judicial officer providing such an application is made by some person other than the owner, manager or general agent of the vessel.

The basis for the inherent equitable authority of the court to enter an order directing the Defendant to provide maintenance and cure is found in *Vaughan*, supra.  The court may also order relief pursuant to 28 U.S.C. § 2201.  It

provides that this Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. *See also*, _____. Pursuant to Federal Rule of Civil Procedure 57, apart from entitlement to a jury where such is otherwise available, the rule also provides that the existence of other adequate remedies do not preclude declaratory relief, and that the court may order a speedy hearing and advance the matter on the calendar. In the instant case, Plaintiff seeks an emergency hearing on the ground that Plaintiff is not otherwise able to secure necessary and proper medical care.

The burden of proving the right to maintenance and cure rests with the seaman, but it is a simple test. All that need be shown is that the Plaintiff is a seaman who was injured while in the service of the vessel. See *Pelotto v. L&N Towing Co.*,604 F.2d 396, 400 (5th Cir. 1979) cited with approval by *Costa Crociere v. Rose*, 939 F.Supp. 1538 (S.D.Fla. 1996). Maintenance and cure is not fault based, and ambiguities or doubts in the application of the law are resolved in favor of the seaman. *Crociere*, id. in the case at bar, the Defendant is unable in good faith to dispute the facts entitling the Plaintiff to maintenance and cure.

16

Though technically distinct, unearned wages are part of "maintenance and cure" and are recoverable, measured from the time of incapacity through the end of the seaman's employment contract. See *Archer v. Trans/American Serv., Ltd.*, 834 F. 2d 1570, 1575 (11th Cir. 1988) cited with approval in *Flores v. Carnival Cruise Lines*, 47 F.3d 1120 (11th Cir. 1995).

Weeks Marine's duty is to guarantee payment in advance and pay Mr. Bloom's medical expenses timely. See *Sullivan v. Tropical Tuna, Inc.*, 963 F. Supp. 42 (D.Mass. 1997). Weeks Marine has repeatedly refused to guarantee payment in advance, it has also failed to pay bills in a timely manner, and it continues to refuse to pay bills that have already been incurred, all as demonstrated above.

The nature of the duty here, and the immediacy of the needs of the Plaintiff, permit and require the prompt action of this court. The actions of the Defendants in setting unreasonable conditions upon Plaintiff's receipt of maintenance and cure are willful, arbitrary and capricious, justifying an award of punitive damages and attorney fees. See *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987).

**WHEREFORE**, Plaintiff moves this Honorable Court for an order setting a speedy hearing, advancing this cause on the calendar, declaring the rights and entitlements of the

17

Plaintiff to maintenance and cure, and directing the Defendant to provide the Plaintiff with maintenance, cure and past due wages, together with interest, an award of punitive damages and attorney fees for the necessity of filing this emergency motion for declaratory relief.  Specifically the order should do the following:

1.   Order Weeks Marine to authorize and provide advance approval of payment for all reasonable and necessary medical treatment, specifically:

    A.   Lumbar injections;

    B.   Physical therapy for the right knee and right shoulder;

    C.   Treatment with Dr. Benjamin Moore for evaluation and treatment for closed head injuries, neuropsychological evaluation and testing, dilantin level checks and depression;

    D.   An MRI of the right shoulder;

    E.   Treatment with Dr. Steven Lancaster;

    F.   Treatment with Dr. Richard Agnew ;

    G.   Follow up treatment with Dr. Bruce Yergin; and

    H.   Payment of all outstanding medical bills;

    I.   Requiring Weeks Marine to pay reasonable costs of Mr. Bloom's travel home from the accident

along with payment for home assistance care
provided to Mr. Bloom By his wife; and

J.   Requiring Defendant to guarantee payment of
medical bills in advance of treatment.

2.   Order Weeks Marine to pay maintenance and as
follows, plus interest:

A.   Lost wages in the amount of $2,353.16;

B.   Room and board maintenance in the amount of
$10,270.16, to date.

C.   Ongoing maintenance through the date that
maximum medical improvement has been attained
as determined by Dr. Steven Lancaster, John
Bloom's treating physician, or until the court
determines that John Bloom has reached MMI.

3.   Order Weeks Marine to pay John Bloom's medical
expenses through the date when maximum medical improvement has
been attained as determined by Dr. Steven Lancaster, John
Bloom's treating physician, or until the court determines that
John Bloom has reached maximum medical improvement.

4.   Award the Plaintiff reasonable attorneys fees and
costs. See *Vaughan v. Atkinson*, 369 U.S. 527, 8 L.Ed.2d 88,
82 S.Ct. 997 (1962).

5.   Find that Weeks Marine's denial of maintenance and
cure has been willful or was the result of intentional

19

wrongdoing and that the Plaintiff is entitled to punitive damages, reserving for later proceedings a determination of the amount of those punitive damages.  See *In re: Amtrak "Sunset Limited" Train Crash in Bayou Canot, Alabama, On September 22, 1993*, 121 F.3rd 1421, 1997 AMC 2962, 2974 (11th Cir. 1997)(Plaintiffs are entitled to punitive damages "in exceptional circumstances such as willful failure to furnish maintenance and cure to a seaman... and in those very situations of intentional wrongdoing.").

6.   Reserve proceedings for damages of pain and suffering caused by Weeks Marine's failure and refusal to provide timely maintenance and cure.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent by telefax (407) 774-2444) and U.S. Mail to Donovan A. Roper, Esq., Roper & Roper, 919 West State Route 436, Suite 350, Altamonte Springs, Florida this _____ day of July, 2002.

PAJCIC & PAJCIC, P.A.

_____
STEPHEN J. PAJCIC, III
Florida Bar No. 141485
Curry G. Pajcic
Florida Bar No. 0021301
One Independent Drive, Ste. 1900
Jacksonville, Florida 32202
Phone: (904) 358-8881
Fax: (904) 354-1180
Attorneys for Plaintiffs

F:\users\CURRY\Bloom\Pleadings\Emerg Motion for Maint & Cure.wpd

## SWORN STATEMENT OF JOHN J. BLOOM

The undersigned, John J. Bloom, swears and affirms as follows:

1.     On February 7, 2002, I was employed by Weeks Marine, Inc. as an able-bodied seaman aboard the Motor Tug Katherine.  As part of my job,  I was instructed by Dennis Clark, the second captain aboard the vessel,  to put some electrical tape on an exposed wire on the mast head and while performing that task a safety harness, which was part of the motor tug Katherine's safety equipment, broke causing me to fall to the deck below.

2.      Weeks Marine has a duty under general maritime law and its contract to provide maintenance and cure.  Weeks Marine has not been providing me with maintenance and cure.

## CURE

2.     I was taken by ambulance to Sentara Norfolk General Hospital where I was treated for my numerous injuries including a fractured humorous, fractured vertebrae,  fibula, three broken ribs, a punctured lung and other injuries.  Upon discharge from that hospital, part of the instructions which I received was an instruction that, because of a puncture to my lung, I was to have an examination performed by a pulmonologist.

3.     After returning to Jacksonville, Florida, Weeks Marine approved treatment by Dr. Stephen Lancaster, an orthopedic surgeon.  I have been examined by Dr. Lancaster on three occasions.  However, even though Weeks Marine agreed to pay for his services, to date Dr. Lancaster has not been paid and during my last visit on May 13, 2002 I was requested to sign a lien making me personally responsible for his charges.

4.     After the initial examination Dr. Lancaster prescribed that I be seen by a pulmonologist because of my lung puncture.  I arranged for North Florida Chest Physicians to see me and to do a pulmonary work up. North Florida Chest Physicians requested authorization from Weeks

EXHIBIT ___A___

Marine but to date Weeks Marine has failed to authorize payment of the charges of North Florida Chest Physicians and therefore the pulmonologist has refused to treat me.

5.      Due to my lung puncture I have experienced fluid build-up in my lungs which has caused persistent coughing resulting in increased back pain and loss of sleep.  While the fluid build up has decreased over time, I still experience coughing and continue to require treatment by a pulmonologist.

6.      I have been experiencing increased back pain since my discharge from the hospital and Dr. Lancaster has prescribed an MRI to determine the source of my back pain.  To date, Weeks Marine has not authorized an MRI to be performed.

7.      I have received bills from the anaesthesiologist who assisted in my surgery and the ambulance service which took my to the hospital indicating that they have not been paid and that they are requesting payment from me for those services.  In addition I have been advised by the company providing rehabilitation services that have not yet been paid for their services.

## MAINTENANCE

8.      In accordance with my contract with Weeks Marine, I am entitled to maintenance at the rate of $20.00 per day.   Maintenance payments were due to begin on the first day that wages are terminated which in this case should have been February 20, 2002.  Up to March 18, 2002 $520.00 in back maintenance payments are due.  After that $20 per day is due.

## WAGES

9.      Weeks Marine is obligated to pay my wages through the end of the voyage which was scheduled to end February 20, 2002.  My daily wages rate is $170.32 per day plus subsistence of $13.00 per day.  I am owed for 13 days for a total of $2353.16.

10.     Copies of my contract and unpaid medical bills are attached hereto.

The above statements are true and correct and I make the statements contained in this

sworn statement subject to the penalty of perjury under the laws of the United States of America.

JOHN J. BLOOM

JACKSONVILLE ORTHOPAEDIC INSTITUTE

BLOOM, JOHN J.          DOB:  04/14/64        CHART# WX204846        Page 1
-----------------------------------------------------------------------
          2/13/2002          STEVEN J. LANCASTER MD
          INITIAL EVALUATION
          COMPREHENSIVE ORTHOPAEDIC CONSULTATION:

                                    DOI:  2/7/02

          CHIEF COMPLAINT: Multiple injuries.

          HISTORY:    The patient is a 37 year old white male who
          sustained a workmen's compensation injury on 2/7/02 out
          of town when he fell while working on a ship sustaining
          multiple injuries.  He was seen through Sentara and
          Northfolk General Hospital where he was evaluated by
          general surgeons as well as the orthopaedic surgeon, Dr.
          Molligan.  Besides the pneumothorax that he was noted
          to have he also had a left proximal fibular fracture, a
          displaced right midshaft humeral fracture, multiple rib
          fractures.

          He was subsequently taken to surgery on 2/8/02 for a
          retrograde nailing with proximal interlocking screws of
          his right humerus fracture. With further investigation he
          was also found to have a T6-T7 minimal anterior
          compression fracture, an old right lateral malleolus
          fracture and a fracture of his left scapula nondisplaced.
          He was also having pain about his right knee but xrays
          were negative.  He was then subsequently released on
          2/13/02 and is seen in my office today in follow up as he
          lives here in Jacksonville. He had previously had
          problems with his eyes but did not have any evaluation of
          this at the time of his accident.  He had some bruising
          about the eyes.  He is now having difficulty walking
          because of both the right knee and the left fibula and
          is in a sling for his right arm.  He is right hand
          dominant.

          Xrays he brings with him demonstrate a mild anterior T6-7
          compression fracture with an old healed right lateral
          malleolus fracture.

          PAST MEDICAL HISTORY:
                    Prior Surgeries:  testicular cancer 1987
                    Allergies:        none.
                    Medications:      Dilantin

          SOCIAL HISTORY:  The patient does not smoke cigarettes,
          does not drink alcoholic beverages.  He is married.
-----------------------------------------------------------------------
BLOOM, JOHN J.          DOB:  04/14/64        CHART # WX204846        Page 1

Steven J. Lancaster, M.D.
Patient Records Incomplete
Without Physicians Interpretation

Exhibit B

JACKSONVILLE ORTHOPAEDIC INSTITUTE

BLOOM, JOHN J.           DOB:  04/14/64        CHART# WX204846        Page 2
-----------------------------------------------------------------------------
       2/13/2002        STEVEN J. LANCASTER MD                        -CONTINUED-
**INITIAL EVALUATION**
FAMILY HISTORY:  is positive for cancer.
REVIEW OF SYSTEMS:  is otherwise negative.


**PHYSICAL EXAMINATION**
      GENERAL: shows a well developed, well
  nourished white male sitting comfortably in a wheel
  chair.
  HEAD AND NECK: examination shows some bruising about
  the right eye with good vision but he reports he only
  has vision in one eye to start with.
  NECK: examination shows no tenderness.
  UPPER EXTREMITIES: show the right arm with a well
  healed scar across the back with some very slight
  serous drainage and the staples do not appear ready
  to be removed at this time.  There are no signs of
  infection.  He has pain with attempts of movement of
  his elbow and his shoulder but has a normal
  neurovascular exam otherwise.
  LOWER EXTREMITIES: show the left leg with pain about
  the proximal third of the fibular area with no
  effusion of the knee.  The right knee shows pain
  about the medial joint line with pain on internal
  external rotation and no varus valgus instability,
  negative drawer, negative McMurray's sign.  He has
  some diffuse pain across the thoracic areas.  There
  is no pain across the right ankle at this time and he
  does have some pain across the left scapular areas.
  There is no bruising noted.


**X-RAY STUDIES**
Xrays here today, AP and lateral of the right humerus
show good positioning of the implant and good alignment
of the rod.

Xrays AP and lateral of the left tibia today show good
positioning of the proximal third fibular fracture.

Review of his CT scan for his pneumothorax demonstrates
potentially a nondisplaced fracture of the left scapula
but the glenoids appear intact on the scan.

**IMPRESSION**
1.  **S/P IM rodding right humerus with proximal and distal**
-----------------------------------------------------------------------------

Steven J. Lancaster, M.D.
Patient Records Incomplete
Without Physicians Interpretation

JACKSONVILLE ORTHOPAEDIC INSTITUTE

BLOOM, JOHN J.          DOB:  04/14/64        CHART# WX204846        Page 3
--------------------------------------------------------------------------------
      2/13/2002          STEVEN J. LANCASTER MD                    -CONTINUED-
IMPRESSION
interlocking screws.
2.  Minimally displaced fracture left proximal third
fibula.
3. Small anterior compression fracture T6-T7.
4. Nondisplaced fracture left scapular wing.
5. R/O right internal knee derangement.
6. Old healed right lateral malleolus fracture.

PLAN
I have given the patient Percocet 5mg 1 poq 4-6 hours PRN
pain #30 and Restoril 30mg 1 poqHS PRN sleep #20.  We
scheduled an MRI evaluation of his right knee to rule out
an internal knee derangement at Beaches Open MRI.  I
placed him into physical therapy at HealthSouth for range
of motion exercises of his right shoulder and elbow.

We will see him back in one week's time after the above
to make further recommendations.


WORK STATUS
He will be off the job for at least the next one month.

SJL/jam
cc: WC

      2/19/2002          STEVEN J. LANCASTER MD
SCHEDULERS NOTES
Patient was scheduled for a MRI of the right knee to rule
out IKD on 2/20 at BOMRI.  Ok'd by Thomas Langan.  kmw

      2/20/2002          STEVEN J. LANCASTER MD
DIAGNOSTIC TEST RESULTS
MRI/RIGHT KNEE:  Shows a full thickness tear of the
posterior cruciate ligament, a tear of the medial
collateral ligament, a bone bruise of the lateral femoral
condyle and a large joint effusion.  There is also some
meniscal capsular separation at the medial collateral
ligament which may represent a medial meniscal tear.
SJL/dhz

Steven J. Lancaster, M.D.
Patient Records Incomplete
Without Physicians Interpretation

--------------------------------------------------------------------------------

05/15/02  03:20  FAX                                                                                    02

# Roberts Disability Consultants

**Rehabilitation Counseling and Social Security Representation**

Member of the National Organization of Social Security Claimants' Representatives
(NOSSCR)

9550 Regency Sq. Blvd., Suite 808
Jacksonville, Florida 32225
Phone 904.722.8901
Fax 904.722.9447

May 13, 2002

Mr. Curry Pajcic, Esquire
1 Independent Dr., Suite 1900
Jacksonville, Fl. 32202

Re:   John J. Bloom
S.S.#: 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

Dear Mr. Pajcic,

In speaking with you the other day, you read to me the definition of maintenance, as it pertains to the above-mentioned case. Please review the options below and choose the one you feel best meets the definition of maintenance and cure.

Mr. Bloom's current living situation is in a home with a mortgage of $1414.00 and currently has a monthly food bill of $500 a month. This is broken down as follows:

**Option 1:**

$47.13 per day for lodging
$16.66 per day for food

**Option 2:**

Currently, taking the situation of an individual with a disability residing in the Jacksonville area the following information was obtained.

$95.00 a day for lodging
$30 a day per diem for food at a corporate rate ($6.00 / breakfast, $12.00 / lunch, $12.00 / dinner).

Exhibit C

## Option 3:

The following figures were obtained through the U.S. Dept. of Labor based on the Consumer Expenditure Survey 2000. For a 38 year-old individual the following expenditures apply:

|                       | <u>Annual</u> | <u>Daily</u> |
|-----------------------|---------------|--------------|
| Housing:              | $15,111.00    | **$41.51**   |
| Shelter:              | $8,930.00     | **$24.53**   |

### Food:

|                       |               |              |
|-----------------------|---------------|--------------|
| Food at home:         | $3,484.00     | $9.57        |
| Food away from home:  | $2,607.00     | $7.16        |
| Total:                | $6,091.00     | **$16.73**   |

If you should have any questions, please call me at (904) 722-8901.

Sincerely,

John B. Roberts, M.H.S.
Social Security Representative
Certified Disability Management Specialist
Certified Case Manager
Certified Senior Disability Analyst and Diplomat

# TUGBOAT AGREEMENT IUOE, LOCAL 25 and WEEKS MARINE, INC.

1

Exhibit D

## **Table of Contents**                                              **PAGE**

| | | |
|---|---|---|
| Preamble | | 4 |
| Section 1 | Bargaining Unit and Territorial Zone | 5 |
| Section 2 | No Strikes, No Lock-outs, Job Security | 5 |
| Section 3 | Hiring Hall | 6 |
| Section 4 | Union Shop, Union Representation, Check-off | 8 |
| Section 5 | Scope | 11 |
| Section 6 | Authorized Deductions | 11 |
| Section 7 | Ability and Qualifications | 11 |
| Section 8 | Safety | 12 |
| Section 9 | Company Officials | 12 |
| Section 10 | Guaranteed Work Week | 12 |
| Section 11 | Manning | 12 |
| Section 12 | Scheduled Work Week & Overtime | 13 |
| Section 13 | Payment of Wages | 14 |
| Section 14 | Holidays | 14 |
| Section 15 | Food Subsistence | 14 |
| Section 16 | Travel, Transportation & Subsistence | 15 |
| Section 17 | Crew Assignments | 17 |
| Section 18 | Watch Rotation | 17 |
| Section 19 | Hazardous Duty Pay | 17 |
| Section 20 | Landing Area | 17 |
| Section 21 | Access for Union Representatives | 17 |
| Section 22 | United States Coast Guard & FCC Documents | 18 |
| Section 23 | Employees Subject to Company's Appointee | 18 |
| Section 24 | Vessel Policy Manual | 18 |
| Section 25 | Mailed Paychecks | 19 |
| Section 26 | Medical Examinations | 19 |
| Section 27 | Employee Quarters | 19 |
| Section 28 | Gear for Employees | 20 |
| Section 29 | Maintenance and Cleaning | 20 |
| Section 30 | Loss of Personal Effects | 21 |
| Section 31 | Letters of Service | 21 |
| Section 32 | Pre-job Conference | 21 |

## **Table of Contents**                                      **PAGE**

| | | |
|---|---|---|
| Section 33 | Lead Dredger | 21 |
| Section 34 | Shop Steward | 22 |
| Section 35 | Grievance and Arbitration | 22 |
| Section 36 | Medical Plan | 24 |
| Section 37 | Pension Plan | 24 |
| Section 38 | Vacation Plan | 25 |
| Section 39 | Annuity Plan | 25 |
| Section 40 | Union Employees | 25 |
| Section 41 | Performance Bond | 26 |
| Section 42 | Privately Insured | 27 |
| | Non-occupational Benefits | |
| Section 43 | Maintenance & Cure | 27 |
| Section 44 | Continuation of Benefits | 27 |
| Section 45 | Death in the Family | 28 |
| Section 46 | Legality | 28 |
| Section 47 | Right of Recall | 28 |
| Section 48 | Training and Licensing | 28 |
| Section 49 | Subcontracting | 29 |
| Section 50 | Full Understanding | 29 |
| Section 51 | Most Favored Nations Clause | 29 |
| Section 52 | Equal Opportunity | 30 |
| Section 53 | Americans with Disabilities Act (ADA) | 30 |
| Section 54 | Family Leave | 30 |
| Section 55 | Term of Agreement | 31 |
| Section 56 | Classifications and Wages | 31 |
| | Signature Page | 31 |
| Appendix A | | 32 |

3

**Agreement**

Made this _21ST_ Day of _NOVEMBER_, 1997 between
**Weeks Marine, Inc.,**
hereinafter referred to as the COMPANY,
**and**
**International Union of Operating Engineers, Local 25, Marine Division, AFL-CIO,**
hereinafter referred to as the UNION.

**<u>Preamble</u>**

This AGREEMENT is entered into to prevent strikes and lockouts and to facilitate peaceful resolution of grievances and disputes between the COMPANY and the UNION; to prevent waste, unnecessary and avoidable delays and the resulting costs they cause the COMPANY; to provide that employment will be in accordance with fair wages and proper working conditions, as provided for hereunder; and further to establish the procedure for amicable adjustment of disputes or questions that may arise between the parties.  The parties hereby agree:

4

**Section 1:**         **Bargaining Unit and Territorial Zone**

This AGREEMENT will cover all work encompassed by all tugboat and tender crew members, both licensed and unlicensed, aboard all tugboat and tenders owned by the COMPANY which are equipped with personnel quarters, engaged primarily in actual dredging operations, mobilization and demobilization of such dredging projects, towing of all dredges, ancillary and other equipment from Port to Port, towing of dump scows to and from disposal sites, towing of dump scows from port to port, ship docking, coastal and ocean towing, and tending operations in connection with marine construction projects whenever any such work is carried on within the territorial zone on the Atlantic Coast from the Canadian border to the southerly border of Key West, Florida, on the Coast of the Gulf of Mexico to the westerly border of Brownsville, Texas and tributary waters in this zone, emptying into the Atlantic Ocean and Gulf of Mexico.

**Section 2:**         **No Strikes, No Lock-outs, Job Security**

The COMPANY agrees that during the life of this AGREEMENT and during any period of arbitration as provided for in Section 35 hereof, there shall be no lockouts of the employees; provided however, that this section shall not be construed to prevent the suspension or termination of employment due to business conditions. The COMPANY also agrees that it will notify the UNION whenever another labor organization claims to represent the employees or any subdivision of employees.

The UNION agrees that during the life of this AGREEMENT:
(a) There shall be no picketing;

(b) That there shall be no strikes or slowdowns by the employees; and the UNION further agrees that during any period of arbitration, as provided in Section 35 hereof, there shall be no picketing, strikes or slowdowns by the employees because of the question submitted to arbitration.

It shall not be a violation of this AGREEMENT and it shall not be a cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a

5

legitimate labor dispute or refuses to go through or work behind any picket line including the picket lines at the COMPANY'S place or places of business. Furthermore, an employee may refuse to cross any picket line when he fears that bodily harm may be done to him. The no-strike provisions of this AGREEMENT are not applicable in the event the employer fails to make contributions to the various funds as are required to be made under this AGREEMENT, including check-off to the UNION.

In the event that any employees or group of employees performs any of the acts prohibited by this Section without the approval of the UNION, such violation shall be proper cause for discharge. Violation by non-members of the UNION shall not be deemed a violation by the UNION, and the COMPANY agrees not to hold the UNION liable for such acts of non-members of the UNION.

**Section 3:**      **Hiring Hall**

The following provisions shall govern in the employment of workers covered by this AGREEMENT:

(a) The UNION shall establish, maintain and keep current an open employment list for the employment of workers competent to perform the duties of the classifications covered by this AGREEMENT.  Such lists shall be established, maintained and kept current on a non-discriminatory basis and shall not be based on or in any way affected by UNION membership, UNION by-laws, rules, regulations, constitutional provisions, or any other aspect or obligation of UNION membership, policies or requirements.

(b) Whenever desiring to employ workers during a non-emergency situation in the classifications specified in this AGREEMENT within the territorial zone specified in Section 1 of this AGREEMENT, the COMPANY shall notify its Lead Dredger of the upcoming vacancies. Within 24 hours of receiving notification from the COMPANY, the Lead Dredger will provide the COMPANY designee with a roster of available qualified candidates to fill the vacancies from the above referenced list.  In addition to the candidate's name, this roster shall include a copy of the individual's United States Coast Guard license (if applicable), a copy of his United States Merchant Mariner's Document, and a brief work history of the candidate.  The

6

Lead Dredger and the COMPANY designee will fill some or all of the positions from this list of candidates.  If for any reason the Lead Dredger is unable or fails to refer qualified and competent workers within the time specified above, the COMPANY may obtain workers from any available labor source.  However, in this case the UNION shall not be responsible with respect to the new hire's documentation and ability.  If the Lead Dredger presents a qualified candidate after the allowable time period has elapsed, the COMPANY will have the exclusive right to decide whether to accept the candidate or continue its pursuit of candidates via other available means.

(c) Whenever desiring to employ workers to fill vacancies on an emergency or short notice basis in the classifications specified in this AGREEMENT within the territorial zone specified in Section 1 of this AGREEMENT, the COMPANY and the Lead Dredger will utilize all options available to them to fill the position as quickly as possible.

(d) The COMPANY has the right to reject any worker referred to it by the UNION. The COMPANY has the right to determine the classification and the number of employees in such classifications needed to efficiently operate its equipment and the UNION agrees not to attempt to abridge these rights of the COMPANY, subject to the UNION'S right to grieve upon same.

(e) The Lead Dredger shall refer to the COMPANY only workers whose names appear on the open employment list and, in so doing, shall be governed by the following criteria:
1.   If the COMPANY requests from the roster a worker by name, he shall be referred by the UNION to the COMPANY.  When the COMPANY requests a worker by name, he shall be deemed competent to perform the duties of his classification, subject to current physical examination, including pre-employment drug testing.

2.   If the COMPANY does not request that a particular worker be referred to it to fill a particular vacancy as provided in subparagraph 1 above, the referral shall be by classes and priorities in the following order:

(i.)Class A will be comprised of all workers competent and

7

experienced in the performance of work in their classification and who have had employment experience with a company making contributions to International Union of Operating Engineers, Local 25, Marine Division Medical Fund. The order of referral within this class of workers shall be in priorities of registration of the applicant in the Hiring Hall.

(ii.)Class B will be comprised of all workers who are competent and able to perform the work in the classification that is to be filled but who have had no employment experience with any company making contributions to International Union of Operating Engineers, Local 25, Marine Division Medical Fund. The order of referral within this class known as "novice class" shall be in priorities of registration of the applicant in the Hiring Hall.

(f) If any individual files a written complaint with either the COMPANY or the UNION that he has been discriminated against in the application of the Hiring Hall provisions of this AGREEMENT, said complaint, if not adjusted to the satisfaction of all parties within five (5) working days, shall be referred to arbitration as hereinafter set forth in Section 35 of this AGREEMENT. All complaints, in order to be subject to such arbitration, must be filed with either the COMPANY or the UNION within ten (10) days from the date of the alleged discrimination.


**Section 4:**        **Union Shop, Union Representation, Check-off**

The COMPANY agrees that, as a condition of continued employment, all employees of the classifications covered by this AGREEMENT shall become members of the UNION within thirty-one (31) days after the execution of this AGREEMENT, or within thirty-one (31) days after being hired, whichever is later, and shall remain members of the UNION while employed by the COMPANY during the life of this AGREEMENT.

The COMPANY is not obligated to take steps to enforce this provision unless due notice is received in writing from the UNION that an employee covered by this AGREEMENT has refused to tender the initiation fee and dues uniformly required as a condition of becoming or remaining a member of the UNION. In the event the

8

COMPANY receives such written notice, it shall investigate the matter, and if the employee refuses to tender the said initiation fee and/or dues retroactive to the 30th day following the execution of this AGREEMENT or the 30th day following the date of his employment, whichever is later, he shall be discharged forthwith. This Section shall not apply in States in which so called "right to work" laws are in effect.

(a)  Copies of Section 3 and 4 of this AGREEMENT shall be posted in their entirety and maintained by, the UNION in conspicuous places in its Hiring Halls and by the COMPANY in conspicuous places where it maintains offices or equipment and where employees or applicants for employment have access.

**CHECK-OFF**

(b)  The COMPANY will check-off dues, assessments and initiation fees, each as certified by the UNION as membership dues in the UNION on the basis of individually signed voluntary check-off authorization cards on forms agreed to by the COMPANY and the UNION.

Unless the COMPANY is otherwise notified by letter from the UNION, the only UNION membership dues to be deducted for payment to the UNION from the pay of the employee who has signed an authorization shall be the supplemental UNION dues consisting of the sum of FORTY CENTS ($.40) per hour for each hour worked under the terms of this collective bargaining AGREEMENT from the effective date thereof.

Remittance will be made on or prior to the 20th day of each month. Such remittance will be made on forms that contain the necessary information and details as to date and hours of employment of employees covered by the terms of this AGREEMENT.

The provisions of this Section shall be effective in accordance with and consistent with applicable provisions of Federal law.

9

**CHECK-OFF:**

**CHECK OFF AUTHORIZATION CARD**

I.U.O.E. LOCAL 25, Marine Division    _____    199___

TO:    _____

               (Name of Company)

I hereby irrevocably authorize _____, my employer, during the life of the present labor agreement and from year to year thereafter, (subject each year to written revocation by me, sent by certified mail, return receipt requested, to the UNION and to the COMPANY during the last two weeks of the month preceding the anniversary date of the AGREEMENT), to deduct my initiation fee, change of classification fee, and monthly dues as specified by the International Union of Operating Engineers, Local 25, including supplemental working dues of forty cents($.40) for each hour worked under the terms of the collective bargaining agreement.  My initiation fee of $_____ shall be paid at the rate of $_____ per week for _____ weeks until my initiation fee is paid in full. Thereafter, my dues per quarter shall be paid in the amount of $_____. I further authorize my employer to deduct $_____ per week for _____ weeks until my current delinquency in the amount of $_____ is paid in full.


_____
          (employee)

_____          _____
(Social Security Number)                         (classification)

10

**Section 5:      Scope**

If any tugboat or tender boat equipped with personnel quarters on
the effective date of this AGREEMENT, not within the territorial
limits covered by this AGREEMENT, is brought within such
territorial limits, the terms and conditions of this AGREEMENT will
become applicable thereto.

**Section 6:      Authorized Deductions**

If any tugboat or tender boat equipped with personnel quarters
within the territorial jurisdiction encompassed by this AGREEMENT
is deployed to an area not covered by this AGREEMENT, the COMPANY
agrees to notify the UNION. If the deployment is to an area not
covered by other collective bargaining agreements with the
International Union of Operating Engineers, Local 25, Marine
Division which provide for medical, pension and annuity payments to
the International Union of Operating Engineers, Local 25 Medical,
Pension and Annuity Plans, any employee accompanying the vessels
covered by this AGREEMEMT or equipment shall have the right to
authorize a deduction from his wages to be paid into such Plans.
It shall be the responsibility of the COMPANY to notify the
employee of his rights to have such deductions made and the
employee is to furnish the COMPANY with a signed authorization for
deduction stating the amounts to be deducted.

**Section 7.      Ability and Qualifications**

The COMPANY reserves and retains the sole and exclusive rights to
manage its operations and to direct the work force except only to
the extent that express provisions of this AGREEMENT specifically
limit or qualify these rights.  These rights include, but are not
limited to, the following: directing the work force, including the
hiring of personnel, the selection of all employees, promoting,
transferring, laying off and discharging personnel, selecting
material and equipment to be used or installed, utilizing any work
methods, procedures, techniques, or labor-saving devices or
machines, establishing rules and regulations, determining when work
is required, and who shall perform the work, designating any work
to be subcontracted and determining the number of persons and
employees required to perform the work,  subject to the right of

11

the UNION to grieve upon the issue.

**Section 8:      Safety**

All employees shall observe all measures established by the COMPANY
for the safety of its employees and shall cooperate with the
COMPANY in carrying out all of the COMPANY'S safety measures and
practices for accident prevention, including those outlined in the
Weeks Marine, Inc. Employee Safety Handbook.

**Section 9:      Company Officials**

No Salaried Employee or any other COMPANY Official shall do repair
work, handle tools, pull levers, or operate a tugboat or any other
equipment on a regular basis so as to deprive employees covered by
this AGREEMENT of work.

**Section 10:     Guaranteed Work Week**

Under normal operations, the COMPANY shall make available to each
employee who is on the job on Monday, five (5) days work per week,
running from Monday through Sunday inclusive, provided the vessel
is operating.

The COMPANY shall make every effort to give employees twenty-four
(24) hours advance notice of a forthcoming temporary or permanent
vessel tie-up. The Lead Dredger and Shop Steward shall be notified
of such temporary or permanent vessel tie-up.

Employees retained by the COMPANY to work or perform maintenance
after the above stated tie up shall be employed on a three (3) day
minimum guaranteed work week.  The work day during these periods
shall consist of twelve (12) hours work, excluding a half hour
lunch period.

**Section 11.     Manning**

Tugboats and Tending boats of 1500 horsepower or less will be
manned with one wheelhouse person (Master or 1st Captain) and one
Engineer if working days only, or with two wheelhouse persons(at
least one of which shall be a Master or 1st Captain), one Engineer

and one Deckhand if working on a 24 hour per day basis.  If the Engineer is on his scheduled time off, a second Deckhand will suffice as the fourth crew member.

Tugboats and Tending boats greater than 1500 horsepower will be manned with one wheelhouse person (Master or 1st Captain), one Engineer and one Deckhand if working days only, or with two wheelhouse persons(at least one of which shall be a Master or 1st Captain), one Engineer and two Deckhands if working on a 24 hour per day basis.

Tugboats and Tending boats moving from port to port, light boat, will be manned with a three (3) person crew consisting of 2 wheelhouse personnel and an Engineer.  If the Engineer is on his scheduled time off, a Deckhand will suffice as the third crew member.

On each vessel, the 1st Captain shall execute the duties and responsibilities of the Master when the Master is not on board.

Each crew member shall work twelve (12) hours per day and shall receive a Daily rate of pay per classification as per SECTION 56.

## Section 12:      Scheduled Work Week & Overtime

A work day shall consist of a twenty-four (24) hour period from midnight to midnight.  Twelve (12) hours shall constitute a day's work.

The normal work schedule shall consist of a two (2) week on and one (1) week off rotation.

Whenever an off-watch Deckhand is broken out by the Captain to perform duties associated with the dumping and closing of dump scows during dredging operations, the Deckhand shall receive overtime pay at 3/24 his daily rate of pay for each hour he is performing such duties.

In all other situations, when an off-watch Deckhand (or Deckhand/Engineer as the case may be on smaller tugs) is broken out by the Captain, the Captain will issue a Chit to the Deckhand for

13

one and one half (1 1/2) times the number of hours that the Deckhand was broken out. This chit can be redeemed for time off from watch, so long as the redemption time span does not interfere with the vessel's operation.

In all cases of break-out, the minimum break-out time shall be one (1) hour.

The work week for all employees covered by this AGREEMENT shall commence midnight on Sunday.

It is recognized by the COMPANY and the UNION that, as a vehicle to allow more time off, a modified work schedule may be put into effect by mutual agreement.

**Section 13.**     **Payment of Wages**

All wages under this AGREEMENT shall be due and payable every week. Wages for the previous weekly pay period will be paid not later than four (4) days after the end of that period. However, if the COMPANY cannot comply with payment within four (4) days after the end of the pay period, the COMPANY and the UNION will mutually agree to an alternative.

**Section 14:**     **Holidays**

Holidays under this AGREEMENT are as follows:

**LABOR DAY**

**THANKSGIVING DAY**

**CHRISTMAS DAY**

**INDEPENDENCE DAY**

For purposes of compensation, the date for the holidays specified above shall be as designated by the Federal Government. An

14

employee who is required to perform work on a Holiday set forth in this Section shall be paid one and one half (1 1/2) times his daily rate of pay for that day.

**Section 15:**     **Food Subsistence**

The COMPANY shall provide each tug or tender covered by this AGREEMENT a food subsistence as specified below per day per crew member for each day that the individual works. To the extent possible, all food subsistence checks will be made available in advance of purchasing food.

For the convenience of the crew, the COMPANY shall provide a vehicle for the purpose of weekly food purchasing. Any crew member operating any vehicle in conjunction with his work activities shall possess a valid driver's license.  If a COMPANY vehicle is not available, the COMPANY will reimburse the crew member for the use of his own personal vehicle at the current Weeks Marine mileage rate.  If neither a COMPANY vehicle nor a crew member's vehicle is available, the COMPANY shall reimburse the crew member for taxi fare from the vessel's petty cash account.

One dollar ($1.00) per crew member per day will be added to the Food Subsistence check to compensate for the crew member's labor cost associated with food shopping.

Whenever possible, the deckhand on watch should perform the task of grub shopping.

The food subsistence shall be paid per crew member per day as follows:

| 10-01-96 | 10-01-97 | 10-01-98 | 10-01-99 | 10-01-00 |
|----------|----------|----------|----------|----------|
| to | to | to | to | to |
| 09-30-97 | 09-30-98 | 09-30-99 | 09-30-00 | 09-30-01 |
| | | | | |
| $9.00 | $10.00 | $10.00 | $10.00 | $10.00 |

15

## Section 16:     Travel, Transportation & Subsistence

When a vessel is operating in any state between Maine and Texas inclusive, the COMPANY will pay a per diem subsistence as specified below to each crew member for each day that the individual works. To avoid undue hardship should a crew member be laid off shortly after returning to work from his time off, the first ten days of the per diem subsistence shall be earned on the individual's first day back to work.

Travel subsistence shall be paid per crew member per day as follows:

| 10-01-96 to 09-30-97 | 10-01-97 to 09-30-98 | 10-01-98 to 09-30-99 | 10-01-99 to 09-30-00 | 10-01-00 to 09-30-01 |
|---|---|---|---|---|
| $9.00 | $10.00 | $11.00 | $12.00 | $13.00 |

In the event a single crew change is scheduled for outside of the United States, the COMPANY will provide transportation for the crew members. In the event of recurring crew changes outside the geographic zone of this AGREEMENT, this section will be immediately reopened for discussion between the COMPANY and the UNION.

When a crew member (i.e., a swing engineer), is required to transfer from one vessel to another without time off between the vessels, the COMPANY shall provide the transportation and the crew member shall receive his daily rate of pay for the day he travels under this circumstance, regardless of whether he spends a complete twelve (12) hours on board vessels.

When a crew member is directed to be at the COMPANY designated crew change site at a specific time, and the crew member actually arrives at the designated place at the designated time, and the arrival of the vessel is delayed, in addition to being placed on the payroll at his normal scheduled start of watch, the crew member shall be reimbursed for lodging and meals as set forth in the COMPANY's expense policy.

16

**Section 17:**        **Crew Assignments**

No tugboat or tender crew member covered by this AGREEMENT will replace another tugboat or tender crew member already assigned to a boat which is covered by this AGREEMENT.

**Section 18:**        **Watch Rotation**

If more than one (1) watch (shift) is employed, the watches shall be rotated on a regular basis as mutually agreed between the COMPANY and the UNION.

Any employee not relieved at the end of his watch shall remain on watch until properly relieved, and shall notify his supervisor and the Shop Steward or the Lead Dredger as soon as possible.

**Section 19.**        **Hazardous Duty Pay**

Handling, transporting dynamite, Pourfex and other explosives shall be deemed penalty time. Crews employed on towing tugs, and tending tugs carrying explosive material on board shall, in addition to his regular pay, receive one twelfth (1/12) of his daily rate of pay for those hours in which they are engaged in handling of same.

**Section 20:**        **Landing Area**

The landing where crews change must be safe and adequately lighted. When local conditions necessitate, the COMPANY must furnish a protected parking area and the COMPANY shall be limited to amount equal to the two hundred fifty dollar ($250.00) insurance deductible for any damages to employee's vehicles parked in such designated areas.  Employee must show proof of an insurance claim, including a police report to be eligible for the two hundred fifty dollar ($250.00) deductible reimbursement.

**Section 21:**        **Access for Union Representatives**

The COMPANY agrees that it will allow accredited representatives of the UNION and of the Medical, Pension, Vacation, and Annuity Plans access to the Plant at all times during working hours to perform

17

official UNION or Plan business and such representatives may use the COMPANY'S transportation facilities from shore to Plant.  The UNION agrees that such representatives will abide by all COMPANY safety policies and not interfere with any of the COMPANY'S employees while at work.  In consideration for access to the Plant, the UNION agrees to indemnify and hold the COMPANY harmless from all claims and damages of any nature whatsoever that the representatives may have including all costs, expenses and attorney's fees.

**Section 22:**     **United States Coast Guard & FCC Documents**

It is agreed that any employee referred to the COMPANY by the UNION must have the appropriate United States Coast Guard documents, including a Master, Mate, Operators or Engineers license, if applicable, and a valid United States Merchant Mariner's Document ("Seaman's Card" or "Z-Card") in every case.  Every Master and Captain, in addition to possessing and carrying a valid United States Coast Guard license, must also possess and carry at a minimum, a valid FCC Restricted Operator's License for VHF Radio Communication.  It is further agreed that each current employee not presently possessing such valid documentation shall be given sixty (60) days after the effective date of this AGREEMENT to comply with this section.

**Section 23:**     **Employees Subject to Orders of Company's Appointee**

All Masters employed by the COMPANY shall exercise all of the authority and responsibility conferred upon them by maritime custom and law, shall have the authority and responsibility to actively participate in the hiring of employees when on foreign voyages in accordance with the hiring provisions of this AGREEMENT, to evaluate employees, to fire or otherwise discipline employees, to direct and assign all work on their vessels, and to direct the operation of their vessels in the interest of the COMPANY, and shall be obligated to exercise these duties and responsibilities on behalf of the COMPANY in accordance with COMPANY policy.

**Section 24:**     **Vessel Policy Manual**

The parties agree that the COMPANY'S Vessel Policy Manual is

18

incorporated into this AGREEMENT by reference, and shall become part and parcel to this AGREEMENT. From time to time this manual will be revised to comply with new regulations and for reasons of improving safety and performance. Any revisions to the Vessel Policy Manual will be agreed upon by both parties.

**Section 25:** **Mailed Paychecks**

Upon written request from the employee, his paycheck will be mailed to the address that he desires without expense to him. Said paycheck will be mailed no later than the designated payday, and if the check is not received within ten (10) business days thereafter, on the employee's request the COMPANY will immediately cancel the original check and issue a substitute check.

An employee shall have the right to pick-up his paycheck at the COMPANY'S payroll office during normal business hours on the designated payday, provided he notifies the COMPANY in advance in writing.

**Section 26:** **Medical Examinations**

All prospective employees required to take a Pre-Employment Physical and Drug and Alcohol Screening will be compensated at a flat rate of Seventy-five Dollars ($75.00) and the COMPANY shall bear all costs for such procedures. The payment of such shall not constitute a job offer.

All employees required to take a post-casualty or probable cause Drug and Alcohol Screening will be compensated at a flat rate of Seventy-five Dollars ($75.00), provided the employee is off the payroll (or off-watch) at the time of the screening.

In the event a prospective employee or employee fails the Drug and Alcohol Screening, the Allowance shall not be paid.

**Section 27:** **Employee Quarters**

It is understood that all employees covered by this AGREEMENT shall be provided with suitable washroom, sanitary facilities and quarters. The COMPANY shall provide a suitable number of blankets,

19

sheets, spreads, pillows, and innerspring mattresses, face soap, laundry soap, lava soap and washing powder.  Each 24 hour crewed vessel shall be equipped with an electric washing machine, electric dryer and electric refrigerator.  In the event one of these appliances should break down, the COMPANY shall repair or replace it within a reasonable amount of time, but in no case shall this repair time exceed thirty days.  The COMPANY agrees to keep the employee's quarters clean and in a sanitary condition.  It is understood that the employees at all times will cooperate in keeping their quarters, messrooms, washrooms and toilets in a clean and in a sanitary condition.

**Section 28:      Gear for Employees**

The following items shall be supplied for use on board each vessel of the COMPANY covered by this AGREEMENT:

1.    Rain gear for crew required to work in inclement weather
2.    Hard hats
3.    Life jackets
4.    Survival suits
5.    Goggles
6.    Welder's hood and gloves

Any employee willfully damaging or destroying or removing without authority, property of the COMPANY, shall be held accountable for same, normal wear and tear. excluded, and shall reimburse the COMPANY for cost of replacement via withholding of wages.  No employee will be required to furnish any tools.  Any future safety items required by the COMPANY's Safety Department, which is not a requirement as of the date of this execution of this AGREEMENT, will be provided by the COMPANY.

**Section 29:      Maintenance and Cleaning**

The crew of the vessels shall be required to maintain a safe and clean vessel.  Each crew member shall be responsible for the cleanliness and sanitary condition of his own or shared room. All effort should be made to minimize unnecessary noise between the hours of 1800 and 0600.

20

**Section 30:**     **Loss of Personal Effects**

If the personal effects of any employee become a total loss because of fire on, or sinking of, the equipment on which he is employed, he shall be paid by the COMPANY the sum of four hundred dollars ($400.00) in full compensation of such loss, whether or not the loss is greater or less than four hundred dollars ($400.00). If the personal effects of any employee are damaged but are not totally lost, because of fire on, or sinking of the equipment on which he is employed, he shall be paid by the COMPANY a sum equal to the fair amount of such damage, not to exceed four hundred dollars ($400.00). Payment of the above amount shall be made to the employee within sixty (60) days of the date of the loss.

**Section 31:**     **Letters of Service**

Upon written request and within thirty (30) days, the Lead Dredger shall provide an employee or former employee a letter of service indicating position held, length of service, and any other information required by the United States Coast Guard.

**Section 32:**     **Pre-job Conference**

It is agreed that if the nature of a COMPANY'S operation is such that it requires a pre-job conference the Business Manager of the UNION and the COMPANY shall agree to such pre-job conference which shall be held between the Business Manager or his designee and designated COMPANY official at a mutually agreeable time and place before the commencement of each job.

**Section 33:**     **Lead Dredger**

A Lead Dredger will be employed whenever the COMPANY employs workers covered by this AGREEMENT. The person employed as a Lead Dredger will be the sole point of contact for the COMPANY in procuring crews and the Lead Dredger will assist the COMPANY in requiring responsible performance of duties by various crew members as well as assisting designated Shop Stewards processing jobsite grievances. The Lead Dredger will also assist the COMPANY in training new employees and promoting the COMPANY safety policies. The Lead Dredger for this AGREEMENT will be one and the same for

21

all agreements in effect between the COMPANY and the UNION. His duties are applicable not just to this labor AGREEMENT between the COMPANY and the UNION. Because of the nature of his duties, the Lead Dredger will be required to work eight (8) hours during a calendar day whenever the COMPANY employs workers in other classifications covered by this AGREEMENT, or as directed by the COMPANY. The Lead Dredger will be reimbursed by the COMPANY for telephone and/or travel expense authorized by the COMPANY on its behalf in connection with his duties. The COMPANY will designate a representative as immediate supervisor of the Lead Dredger to oversee and direct the daily activities of the Lead Dredger.

The Lead Dredger shall be permitted to attend all officially called regular meetings of the UNION and all special meetings as may be called from time to time without loss of pay or subsistence.

**Section 34:    Shop Steward**

The COMPANY will recognize two (2) working employees, who shall be designated by the UNION and approved by the COMPANY, to act as Shop Stewards for all employees covered under this AGREEMENT, for the purpose of processing grievances arising from the terms of this bargaining AGREEMENT.

When there is a reduction in the work forces during periods of reduced employment, the Shop Stewards will be the last employees within their classification to be laid off; provided that they are qualified to perform the available work, and they will be the first employees to be recalled when work resumes; provided that they are qualified to perform the available work. The Shop Stewards will be permitted to attend not more than five (5) officially called regular meetings of the UNION, without loss of pay, provided that absences shall not exceed one shift.

**Section 35:    · Grievance and Arbitration**

All complaints, disputes or grievances arising between the parties hereto, relating to or in connection with, or involving questions of interpretation or application of any clause of this AGREEMENT, or any acts, conduct or relations between the parties, directly or indirectly, shall be processed pursuant to this Section. Except as

22

otherwise provided, the UNION and the COMPANY agree that there shall be no strikes or lockouts or work stoppages without having first utilized all procedures set forth herein.

STEP ONE:      Any employee covered by this AGREEMENT who alleges the existence of such a dispute must present his/her grievance in writing to the Vessel Operations Manager within seven (7) working days of the date of the occurrence  which is the subject of the grievance.  The Vessel Operations Manager shall transmit the grievance to the "Quick Dispute Resolution Committee" within two (2) working days of receiving it from the employee.  The Committee shall answer the grievance, in writing, within seven (7) days after receipt of the written grievance.  Said Committee shall consist of two (2) UNION and two (2) COMPANY representatives.

STEP TWO:      If the grievance is not satisfactorily settled on the basis of the Committee's answer, it may be processed to the second step of the grievance procedure by written notice to the UNION Business Manager and the Towing Division Manager within seven (7) working days of receipt of the Committee's answer.  A grievance shall be deemed settled on the basis of the Committee's answer if not processed to the second step within the time limits specified herein.

STEP THREE:    Should the procedure referred to in STEP ONE and STEP TWO, above, fail to amicably and mutually adjust and settle the grievance or dispute, or in the event of a grievance raised by the COMPANY, the matter shall then be submitted to arbitration upon written request of the UNION or the COMPANY.  The UNION'S written request must be made seven (7) working days after the final decision of the Committee has been given pursuant to the foregoing provisions of this Section.

STEP FOUR:     Within two (2) working days following a written request for arbitration of a grievance, the COMPANY and the UNION shall meet or confer for the purpose of selecting an impartial arbitrator from list or lists to be supplied by the New Jersey Board of Mediation.

STEP FIVE:     Arbitration will be conducted pursuant to the voluntary labor arbitration rules of the New Jersey Board of

23

Mediation.   The parties, by mutual agreement, may extend the time limits set forth in STEP ONE through STEP FOUR.

STEP SIX:       The decision of the arbitrator shall be final and binding upon both the UNION and the COMPANY.   The arbitrator's fees and expenses and other arbitration costs shall be shared equally by the UNION and the COMPANY.   The arbitrator shall have jurisdiction and authority only to interpret and apply the provisions of this AGREEMENT with respect to the controversy being arbitrated, and shall not have authority to add to, detract from, alter, or amend any of the provisions contained herein.

**Section 36:      Medical Plan**

The COMPANY, as of October 1, 1997, shall contribute to Local 25, Marine Division, International Union of Operating Engineers Medical Fund, established by an Agreement and Declaration of Trust entered into as of the 1st day of October, 1959, the sum of One Dollar and Ninety-six Cents ($1.96) per hour for each hour worked by its employees covered by this collective bargaining AGREEMENT. An additional contribution to the Local 25 Medical Fund of one percent (1%) of all straight time wages paid to the employees, shall be added to and remitted with the One Dollar and Ninety-six Cents ($1.96) per hour contribution currently called for by this collective bargaining AGREEMENT.   The COMPANY shall be bound by all of the provisions of said Agreement and Declaration of Trust as the same now exists or may be hereafter amended by the parties thereto.

**Section 37:      Pension Plan**

The COMPANY, as of October 1, 1996, shall contribute to Local 25, Marine Division, International Union of Operating Engineers Pension Fund, established by an Agreement and Declaration of Trust entered into as of the 1st day of October, 1962 the sum of One Dollar and Twenty-five Cents ($1.25) per hour for each hour worked by its employees covered by this collective bargaining AGREEMENT. The COMPANY shall be bound by all of the provisions of said Agreement and Declaration of Trust as the same now exists or may be hereafter amended by the parties thereto.

24

**Section 38:      Vacation Plan**

The COMPANY, as of October 1, 1997, shall contribute to Local 25, Marine Division, International Union of Operating Engineers Vacation Plan, established by an Agreement and Declaration of Trust entered into as of the 1st day of October, 1962 , seven percent (7%) of the straight time rate multiplied by the total hours worked, for the purpose of assuring each and every employee covered by this AGREEMENT an equitable vacation pay, irrespective of the number of employers for whom he has performed work.

**Section 39:      Annuity Plan**

The COMPANY, as of October 1, 1996, shall contribute to Local 25, Marine Division, International Union of Operating Engineers Annuity Fund, established by an Agreement and Declaration of Trust entered into as of the 1st day of October, 1990, the following sums for each hour worked by its employees covered by this collective bargaining AGREEMENT. The COMPANY shall be bound by all of the provisions of said Agreement and Declaration of Trust as the same now exists or may be hereafter amended by the parties thereto.

1. For Classifications A&B: the sum of One Dollar and Sixty Cents ($1.60) per hour for each straight time hour of employment, the sum of Two Dollars and Forty Cents ($2.40) per hour for each time and one-half (1 1/2) hour of employment and:

2. For Classification C: the sum of One Dollar and Thirty Cents ($1.30) per hour for each straight time hour of employment and the sum of One Dollar and Ninety-five Cents ($1.95) per hour for each time and one-half (1 1/2) hour of employment and:

3. For Classification D: the sum of One Dollar ($1.00) per hour for each straight time hour of employment and the sum of One Dollar and Fifty Cents ($1.50) per hour for each time and one-half (1 1/2) hour of employment.

**Section 40:      Union Employees**

The COMPANY recognizes and agrees that the International Union of Operating Engineers, Local 25, Marine Division, Medical Fund,

25

Pension Fund, Vacation Plan and Annuity Plan, in addition providing coverage for employees within the classifications set forth in this collective bargaining AGREEMENT, has covered and will cover those Officers, Business Agents and Employees of the UNION for whose benefits the UNION pays employer contributions in the same amounts as are contributed by COMPANY herein and other contributing employers pursuant to the provisions of Sections 36, 37, 38 and 39 of this AGREEMENT.

**Section 41:      Performance Bond**

The COMPANY agrees to post a financial guarantee bond or cash equivalent as agreed to and established by the Board of Trustees. In the event that the COMPANY should become delinquent in its reports and payments to the Medical, Pension, Vacation, and Annuity funds, the UNION shall have the right to withhold employees covered by this AGREEMENT from the COMPANY, and the COMPANY will, nevertheless, be obligated to continue the employees wages at the rates listed in this collective bargaining AGREEMENT until such time as the delinquent reports and payments have been made in accordance with the below listed sections; the no strike clause notwithstanding, provided however:

a) No employees shall be withheld from any COMPANY under this Section where the COMPANY has posted a bond, and/or cash to secure his obligation to make reports and payments to the Medical, Pension, Vacation, and Annuity funds, so established as hereinabove provided, so long as the amount of bond so posted and/or cash deposited as security is sufficient to satisfy all debts, arrears or deficits due the above listed plans by said COMPANY.

b) No employees shall be withheld from any COMPANY under this Section until:

1.   The Administrator of the various plans mentioned above, or the designee of the UNION, shall have first communicated with the said COMPANY apprising him of the delinquency or arrearages.

2.   In the event that the said COMPANY fails to satisfy all its obligations to the above listed funds, after receiving notification from the office of the Administrator, the UNION Office shall be so

notified. The Business Manager of the Local Union shall contact the COMPANY to arrange for immediate satisfaction of all claims. If claims for delinquency or arrearage are not satisfied immediately, the UNION shall have the right to withhold its employees until such delinquency is satisfied.

3.   In the event that said COMPANY fails to post the aforesaid financial guarantee bond or cash equivalent, the said COMPANY shall make weekly payments to the Medical, Pension, Vacation and Annuity funds and shall remain current in their payments.

4.   It is understood that all contributors to the Medical, Pension, Vacation and Annuity funds shall sign the AGREEMENT. An executed copy of this AGREEMENT shall be transmitted to the Administrator of the aforesaid funds.

## Section 42:      Privately Insured Non-occupational Benefits

Excluding only the States of New Jersey and Rhode Island where contributions are made to State funds established by law, the COMPANY agrees to provide in other States within the territorial limits of this AGREEMENT privately insured non-occupational sickness and accident benefits identical with the benefits provided under New York State law.

## Section 43:      Maintenance and Cure

Employees who are entitled to Maintenance and Cure under the general Maritime Law shall be paid Maintenance at the rate of Twenty Dollars ($20.00) per day with payments to be made bi-weekly.

## Section 44:      Continuation of Benefits

The COMPANY agrees to continue contributions to the Local 25 Medical and Pension Funds for an employee who becomes unemployed by reportable Occupational Injuries or Occupational Illness. Such contributions shall be made in accordance with the schedule of eligibility as determined by the Board of Trustees.

27

**Section 45:**       **Death in Family**

In case of death in an employee's immediate family (i.e. spouse, child, mother, father, sister, brother, employee's grandmother, grandfather) the COMPANY shall grant such employee a maximum of three (3) days off with pay for the express purpose of attending services for the deceased, provided those days are regular scheduled work days.  A death certificate or other satisfactory proof of death must be submitted to the employer.  The employee must be working for the COMPANY on the date of death and must have worked for the COMPANY for at least six months within the year immediately preceding the date of death of the family member.

**Section 46:**       **Legality**

It is mutually agreed that if the adoption of any State or Federal Legislation or regulation conflicts with or is contrary to any of the provisions of this AGREEMENT, negotiations will be opened to make the necessary adjustment in the AGREEMENT, but the negotiations will be confined to changes in existing law or regulations.

**Section 47:**       **Right of Recall**

If the COMPANY has no intention of recalling an employee at the end of his assignment, then the COMPANY shall notify the employee and the UNION, in writing, at the completion of the project that the employee will not be recalled. Failure to do so shall be considered evidence that the employee remains in good standing with the COMPANY.

**Section 48:**       **Training and Licensing**

The COMPANY and the UNION mutually agree that they shall encourage all employees to upgrade their skills.

Any employee, who is required by Federal, State or Local law or by COMPANY policy to hold a valid United States Coast Guard or other license or certificate and who has been employed by the COMPANY for five (5) years, shall be reimbursed by the COMPANY for any renewal fee charged by the United States Coast Guard or other

administrative agency for such license or certification. Those employees with between two (2) and five (5) years service with the COMPANY shall be reimbursed on a yearly pro-rata basis.

The COMPANY and the UNION agree to establish a Committee on Training, Licensing, and Safety, whose function shall be to seek to improve the skills and safety of the employees and to make recommendations on Training, Licensing, and Safety. Additionally, the Committee shall develop policies and procedures with respect to proficiency testing, incentive programs, and training funding. Said Committee shall consist of equal representatives from the COMPANY and the UNION and meet no less than once per quarter.

**Section 49:**     **Subcontracting**

The COMPANY, to the extent that it is engaged in on-site dredging work, agrees that it will not sublet any tugboat or towing work coming under the jurisdiction of International Union of Operating Engineers, Local 25, Marine Division to any contractor who is not a signatory to an agreement with the aforesaid Local Union, except where subcontractors satisfactory to the COMPANY cannot be furnished. The UNION and the COMPANY agree to discuss the matter so that the COMPANY may sublet to a contractor who can fulfill the requirements.

**Section 50:**     **Full Understanding**

It is mutually agreed that this AGREEMENT covers the entire understanding between the parties and this AGREEMENT shall in no way be modified or changed except by mutual consent in writing. The COMPANY shall not be obligated to continue any benefit or employee practice which it has given or engaged in prior to the execution of this AGREEMENT unless specifically set forth in this AGREEMENT.

**Section 51:**     **Most Favored Nations Clause**

The COMPANY has the right to review any labor agreements to which the UNION is signatory. The COMPANY has the right to make any language changes in these other agreements a part of this AGREEMENT at its option.

29

**Section 52:      Equal Opportunity**

During the term of this AGREEMENT , nether Party shall discriminate against any employee or applicant for employment because of race, color, sex, age, religion, national origin or UNION membership. This nondiscrimination policy shall include, but not be limited to, the following: employment, promotion, upgrading, transfer, layoff, demotion, termination, rates of pay, forms of compensation, recruitment or recruitment advertising and selection for training. However, notwithstanding anything to the contrary in this Section, no one under the age of eighteen (18) shall be eligible for employment.

The COMPANY and the UNION agree that the WEEKS MARINE, INC. Equal Opportunity program and Affirmative Action program shall be considered part of this AGREEMENT. The COMPANY will make copies available upon request.

**Section 53:      Americans with Disabilities Act (ADA)**

The COMPANY agrees that it shall not discriminate against employees on the basis of a physical or mental disability. The UNION agrees that employees dispatched from the Hiring Halls will be qualified to perform the required shipboard duties. The Parties agree that, in the event an employee suffering from a disabling condition requests an accommodation to enable him/her to perform essential functions aboard the vessel, every reasonable effort will be made to accommodate the employee. Such accommodation will not, however, be required if it would create an undue hardship or would represent a substantial threat to safety and well being of the COMPANY, the employee requesting the accommodation or other crew members.

**Section 54:      Family Leave**

The Parties hereby agree that the COMPANY will comply with the provisions of the Family and Medical Leave Act of 1993, which establishes minimum standards for family and medical leave. The COMPANY further agrees to incorporate the provisions of the Act in their COMPANY policy and make said Policy available upon request.

30

**Section 55:**          **Term of Agreement**

It is mutually agreed that this AGREEMENT cover the entire understanding between the parties and this AGREEMENT shall not be modified or changed in any other way, except by mutual consent in writing.

This AGREEMENT shall take effect as of October 1, 1996 and shall remain in full force and effect until September 30, 2001 and from year to year thereafter unless on or before the first day of August 2001 or on or before the first day of August of any year thereafter a written notice of termination or of any proposed changes shall have been served by either party on the other.

The UNION reserves the right to allocate a portion of the negotiated wage increases to any of the Fringe Benefit Plans as it deems necessary.


**Section 56:**          **Classifications and Wages**

The daily rate wage schedule shall be in effect seven (7) days per week, three hundred sixty five (365) days per year, as of the dates indicated when the following classifications as set forth in "Appendix A", as attached, are employed.


**IN WITNESS HEREOF**, the parties hereto have caused these presents to be signed and duly executed

FOR THE COMPANY                  INTERNATIONAL UNION OF OPERATING
                                 ENGINEERS, LOCAL 25, MARINE DIVISION

BY:                              BY:

BY:                              BY:

ATTEST:                          ATTEST:

31

# Appendix A

| CLASSIFICATION | | 10-01-96 to 09-30-97 | 10-01-97 to 09-30-98 | 10-01-98 to 09-30-99 | 10-01-99 to 09-30-00 | 10-01-00 to 09-30-01 |
|---|---|---|---|---|---|---|
| **I. For Tugs of 2000 HP or Greater** | | | | | | |
| MASTER | A | $307.80 | $318.57 | $329.72 | $341.26 | $353.21 |
| 1ST CAPTAIN | B | $278.45 | $284.58 | $291.69 | $298.98 | $306.46 |
| 2ND CAPTAIN | B | $253.00 | $258.57 | $265.03 | $271.66 | $278.45 |
| ENGINEER | C | $253.00 | $258.06 | $263.22 | $268.49 | $273.86 |
| AB DECKHAND | D | $165.00 | $167.48 | $169.99 | $172.54 | $175.12 |
| OS DECKHAND | D | $125.00 | $126.88 | $128.78 | $130.71 | $132.67 |
| **II. For Tugs Between 1000 HP & 2000 HP** | | | | | | |
| MASTER | A | $292.00 | $302.22 | $312.80 | $323.75 | $335.08 |
| 1ST CAPTAIN | B | $266.00 | $271.85 | $278.65 | $285.61 | $292.75 |
| 2ND CAPTAIN | C | $240.00 | $244.80 | $249.70 | $254.69 | $259.78 |
| ENGINEER | C | $240.00 | $244.80 | $249.70 | $254.69 | $259.78 |
| AB DECKHAND | D | $165.00 | $167.48 | $169.99 | $172.54 | $175.12 |
| OS DECKHAND | D | $125.00 | $126.88 | $128.78 | $130.71 | $132.67 |
| **III. For Tugs of 1000 HP or Less** | | | | | | |
| MASTER | B | $277.00 | $283.09 | $290.17 | $297.43 | $304.86 |
| 1ST CAPTAIN | B | $252.50 | $258.06 | $264.51 | $271.12 | $277.90 |
| 2ND CAPTAIN | C | $228.00 | $232.56 | $237.21 | $241.96 | $246.79 |
| ENGINEER | C | $228.00 | $232.56 | $237.21 | $241.96 | $246.79 |
| AB DECKHAND | D | $165.00 | $167.48 | $169.99 | $172.54 | $175.12 |
| OS DECKHAND | D | $125.00 | $126.88 | $128.78 | $130.71 | $132.67 |

Masters and Captains in categories I and II above who possess a valid Oceans Endorsement on their U.S. Coast Guard license, and Engineers who possess a valid U.S. Coast Guard license for 4000 HP or greater shall receive an additional $24.00 per day over the above listed day rates.

# AMENDMENT #1
# TUBGOAT AGREEMENT

Pursuant to Section 55, this amendment made this 1st day of October 1997, to the existing collective Bargaining Agreement between Weeks marine, Inc. hereafter referred to as the *"Company"* and IUOE Local 25 Marine Division, AFL-CIO, hereafter referred to as the *"Union"*

The existing collective Bargaining Agreement between the "Company" and the "Union" covering the territorial zone on the Atlantic Ocean from the Canadian Border to the Southerly Border of Key West, Florida, on the coast of the Gulf of Mexico to the Westerly border of Brownsville, Texas and tributary waters in this zone emptying into the Atlantic Ocean and Gulf of Mexico.

**SECTION 43:**                                  **ANNUITY**

The Company shall contribute to the IUOE Local 25, Marine Division Annuity Fund, established by an Agreement and Declaration of Trust entered into as of the 1st day of October 1990, the following sums for each hour worked by its employees covered by this Collective Bargaining Agreement.   The Company shall be bound by all of the provisions of said Agreement and Declaration of Trust as the same now exists or may be hereinafter amended by the Parties hereto: as of October 1, 1997 the following shall be contributed to the IUOE Local 25, Marine Division Annuity Fund.

1.  For Classification A & B: the sum of One Dollar and Ninety Cents ($1.90) per hour for each straight time hour of employment and the sum of Two Dollars and Eighty Five Cents ($2.85) per hour for each time and one half hour of employment and

2.  For Classification C: the sum of One Dollar and Fifty Cents ($1.50) per hour for each straight time hour of employment and the sum of Two Dollars and Twenty Five Cents ($2.25) per hour for each time and one half hour of employment and

3.  For Classification D: the sum of One Dollar and Ten Cents ($1.10) per hour for each straight time hour of employment and the sum of One Dollar and Sixty Five Cents ($1.65) per hor for each time and one half hour of employment.

As of October 1, 1998, the following shall be contributed to the IUOE Local 25, Marine Division Annuity Fund:

1.  For Classifications A & B: the sum of Two Dollars and Twenty Cents ($2.20) per hour for each straight time hour of employment and sum of Three Dollars and Thirty Cents ($3.30) per hour for each time and one half hour of employment and

2.  For Classification C: the sum of One Dollar and Seventy Cents ($1.70) per hour for each straight time hour of employment and Two Dollars and Fifty Cents ($2.55) for each time and one half of employment and

3.  For Classification D: the sum of One Dollar and Twenty Cents ($1.20) per hour for each straight time hour of employment and the sum of One Dollar and Eight Cents ($1.80) per hour for each time and one half hour of employment.

As of October 1, 1999, the following shall be contributed to the IUOE Local 25, Marine Division Annuity Fund:

1. For Classification A&B: the sum of Two Dollars and Fifty Cents ($2.50) per hour for each straight time hour of employment and the sum of Three Dollars and Seventy-Five Cents ($3.75) per hour for each time and one half hour of employment and

2. For Classification C: the sum of One Dollar and Ninety Cents ($1.90) per hour for each straight time hour of employment and the sum of Two Dollars and Eighty-Five Cents ($2.85) per hour for each time and one half hour of employment and

3. For Classification D: the sum of One Dollar and Thirty Cents ($1.30) per hour for each straight time hour of employment and the sum of One Dollar and Ninety-Five Cents ($1.95) per hour for each time and one half hour of employment.

As of October 1, 2000, the following shall be contributed to the IUOE Local 25, Marine Division Annuity Fund:

1. For Classification A&B: the sum of Two Dollars and Eighty Cents ($2.80) per hour for each straight time hour of employment and the sum of Four Dollars and Twenty ($4.20) per hour for each time and one half hour of employment and

2. For Classification C: the sum of Two Dollars and Ten Cents ($2.10) per hour for each straight time hour of employment and the sum of Three Dollars and Fifteen Cents ($3.15) per hour for each time and one half hour of employment and

3. For Classification D: the sum of One Dollar and Forty Cents ($1.40) per hour for each straight time hour of employment and the sum of Two Dollars and Ten Cents ($2.10) per hour for each time and one half hour of employment.

BY: _____

George Wittich
Vice President
WMI Towing Division

_____
ATTEST

BY: _____

William Zenga
Business Manager
IUOE Local 25

_____
ATTEST

# AMENDED DAILY RATE FOR TUG CREW MEMBERS

## FOR TUGS OF 2000 HP OR GREATER

| POSITION | CODE | 10/01/97 to 09/30/98 | 10/01/98 to 09/30/99 | 10/01/99 to 09/30/00 | 10/01/00 to 09/30/01 |
|---|---|---|---|---|---|
| MASTER w/oceans endors. | TW 11 | $338.98 | $346.52 | $354.46 | $362.81 |
| 1st CAPTAIN w/oceans endors | TW 12 | $304.98 | $308.50 | $312.18 | $316.06 |
| 2nd CAPTAIN w/oceans endors. | TW 13 | $278.98 | $281.83 | $284.86 | $288.05 |
| ENGINEER w/license | TW 14 | $279.66 | $282.42 | $285.29 | $288.26 |
| MASTER without endors. | TW 15 | $314.98 | $322.52 | $330.46 | $338.81 |
| 1st CAPTAIN without endors. | TW 16 | $280.98 | $284.50 | $288.18 | $292.06 |
| 2nd CAPTAIN without endors. | TW 17 | $254.98 | $257.83 | $260.86 | $264.05 |
| ENGINEER without license | TW 18 | $255.66 | $258.42 | $261.29 | $264.26 |

## FOR TUGS BETWEEN 1000 & 2000 HP

| POSITION | CODE | 10/01/97 to 09/30/98 | 10/01/98 to 09/30/99 | 10/01/99 to 09/30/00 | 10/01/00 to 09/30/01 |
|---|---|---|---|---|---|
| MASTER w/oceans endors. | TW 21 | $322.62 | $329.60 | $336.95 | $344.68 |
| 1st CAPTAIN w/oceans endors. | TW 22 | $292.25 | $295.45 | $298.81 | $302.35 |
| 2nd CAPTAIN w/oceans endors. | TW 23 | $266.40 | $268.90 | $271.49 | $274.18 |
| ENGINEER w/license | TW 24 | $266.40 | $268.90 | $271.49 | $274.18 |
| MASTER without endors. | TW 25 | $298.62 | $305.60 | $312.95 | $320.68 |
| 1st CAPTAIN without endors. | TW 26 | $268.25 | $271.45 | $274.81 | $278.35 |
| 2nd CAPTAIN without endors. | TW 27 | $242.40 | $244.90 | $247.49 | $250.18 |
| ENGINEER without license | TW 28 | $242.40 | $244.90 | $247.49 | $250.18 |

## FOR TUGS 1000 HP OR LESS

| POSITION | CODE | 10/01/97 to 09/30/98 | 10/01/98 to 09/30/99 | 10/01/99 to 09/30/00 | 10/01/00 to 09/30/01 |
|---|---|---|---|---|---|
| MASTER | TW 31 | $279.49 | $282.97 | $286.63 | $290.46 |
| 1st CAPTAIN | TW 32 | $254.46 | $257.32 | $260.32 | $263.50 |
| 2nd CAPTAIN | TW 33 | $230.16 | $232.42 | $234.76 | $237.19 |
| ENGINEER w/license | TW 34 | $254.16 | $256.42 | $258.76 | $261.19 |
| ENGINEER without license | TW 35 | $230.16 | $232.42 | $234.76 | $237.19 |

## DECKHANDS ON ALL TUGS

| POSITION | CODE | 10/01/97 to 09/30/98 | 10/01/98 to 09/30/99 | 10/01/99 to 09/30/00 | 10/01/00 to 09/30/01 |
|---|---|---|---|---|---|
| ABLE BODIED SEAMAN | TW 41 | $166.28 | $167.59 | $168.94 | $170.32 |
| ORDINARY SEAMAN | TW 42 | $125.68 | $126.38 | $127.12 | $127.87 |

## 1.21   TUGBOAT EMPLOYEE PROBATIONARY PERIOD

The probationary period is intended to give new employees the opportunity to demonstrate their ability to achieve a satisfactory level of performance and to determine whether the new position meets their expectations.  Weeks Marine, Inc. uses this period to evaluate employee capabilities, work habits, ability to adapt to shipboard life, and overall performance. Upon notifying the Union, Weeks Marine, Inc. may end the employment relationship at any time during the probationary period, with or without cause or advance notice.

All new WMI tugboat employees work on a probationary basis for the first 28 working days after their date of hire.  The Union will be notified when the probationary period commences.  If both Weeks Marine, Inc. and the Union determine that the designated probationary period does not allow for sufficient time to thoroughly evaluate the employee's performance, the probationary period may be extended for a specified period, not to exceed another 28 working days.

Upon completion of the probationary period, the employee's performance is reviewed by management, the tug Master, and possibly also by the 1st Captain.

The results of this review will determine if the new employee:

1.      Enters into "regular" employment status; or

2.      Is determined to be not appropriate for tugboat employment.

If the employee enters into "regular" employment status, he will then be subject to section 4, "UNION SHOP" of the Tugboat Collective Bargaining Agreement.

## 1.22   "GREEN" DECK HANDS

When a new deck hand, with no union affiliation with Local 25 IUOE, is deemed to be inexperienced in tugboat operations - as determined by management, he will be required to undergo apprentice training and orientation.  Said training and orientation shall consist of working alongside an experienced tugboat deck hand for a total of two shifts (12 hours) prior to commencing work on a regular shift in his new position aboard a WMI tugboat.  In addition to the normal deck hand routine, the new employee will receive his safety orientation and his vessel familiarization training.  During this training and orientation period, the new employee will receive wages equal to 25 % of the O/S Deck Hand daily rate of pay.

# WEEKS MARINE, INC.
### AND ASSOCIATED COMPANIES

### CORPORATE POLICY

**SUBJECT:**      DRUGS AND ALCOHOL
**APPLIES TO:**   All employees, subcontractors, and other individuals under Company direction
**PURPOSE:**      To state the Company's prohibitions and restrictions against the use and possession of or other activities related to drugs or alcohol and its policy for testing in order to protect the life, health, and safety of its employees and others, and to make those subject to this policy aware of the penalties for violation.

## DEFINITIONS

For the purpose of this policy, the following definitions apply.

**Company Premises:** All Company-owned or -leased properties and facilities, including all sites at which Company work is being performed, parking lots, and all offices, desks, lockers, trucks, vehicles, aircraft, vessels, and equipment used in Company operations or business.

**Drugs:** Any illegal drug or other mind- or mood-altering substance, inhalant, or prescription drug, the use of which has not been authorized as defined below.

**Failure to Comply with Testing:** Failure to report to the collection site for testing immediately upon being instructed to do so; failure to provide adequate urine samples within three hours of being instructed to do so (anyone who does not produce an adequate urine sample when instructed to do so will wait under medical supervision until the three hours has expired or the sample is produced) or failure to provide adequate breath or alcohol strip samples, without a medically verifiable reason; or engaging in conduct that clearly obstructs the testing process such as, in the opinion of a certified Medical Review Officer (MRO), providing an adulterated sample (for example, low or no creatinine) or a sample below acceptable body temperature levels.

**Personnel:** All employees, subcontractors, and other individuals Under Company Direction.

**Under Company Direction:** Employees who are engaged in Company business, and subcontractors, third parties, or other individuals who are engaged in work for the Company or are otherwise under the authority of the Company.

**Under the Influence:** Alcohol concentration in excess of (a) the legally established limit where the Company Premises are located, or the limits set forth in Part 382 (Controlled Substance and Alcohol Use and Testing), Subpart B, of the U.S. Department of Transportation Federal Highway Administration's Safety Regulations.

## POLICY STATEMENT

The Company is committed to maintaining a safe, productive work environment for its employees and other individuals doing business with the Company. It is not the Company's intention to catch an individual in wrongdoing, but rather to discourage the use and possession of these substances in order to protect the life and health of the Company's employees and customers and the public.

All Personnel are strictly prohibited from possessing, using, selling, purchasing, transferring, or having detectable amounts of Drugs in their systems; and from being Under the Influence of alcoholic beverages while on Company Premises, or operating Company equipment, or from consuming alcohol beverages while on Company work sites.

## POLICY COMPLIANCE

All Personnel are expected to comply with this policy for his or her own safety, for the safety of other Personnel, and for the good of the Company. However, in order to ensure compliance, the Company will from time to time take one or more of the following steps:

1.  Search Company Premises, Personnel, and others on Company Premises, including the personal effects of such persons, to the extent allowable by law.
2.  Perform urine drug screen tests, breath analysis, alcohol strip tests, blood testing or other scientifically approved testing or investigative examination as specified in the Testing section below.

# ROPER & ROPER, P.A.

ATTORNEYS AT LAW

**919 West State Road 436, Suite 350**
**Altamonte Springs, FL 32714**

Donovan A. Roper, Esquire
Teresa S. Roper, Esquire
Dennise Hernandez Gruber, Esquire

Telephone : (407) 774-2444
Facsimile :   (407) 869-4343
E-Mail: droperpa@juno.com

Christopher W. Hardee, Paralegal
G. Lynne Page, Paralegal

April 19, 2002

via. Facsimile

Curry Pajcic, Esquire
Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013

RE:   Bloom v. Weeks Marine

Dear Mr. Pajcic:

In follow-up and response to your telephone call and our subsequent telephone conversation of this morning regarding your potential filing of a motion for injunctive relief to prevent Weeks Marine, Inc. representatives from having any written communication with Mr. Bloom's authorized treating physicians or health care providers for monitoring purposes, except for matters regarding authorization and billing and even though you are carbon copied on all such correspondence, please be advised first of all that we are still in disagreement with your position, but that in light of the April 24, 2002 Fed. R.Civ.P. Rule 26 discovery conference in Jacksonville and subsequent discovery order, it appears unnecessary at this juncture to litigate that issue in Federal District Court. Stated differently, it does not appear that you will have any need to file such a motion for injunctive relief. However, for the next two weeks, or until the Rule 26 discovery order is issued, we must insist that Week's Marine, Inc. be continually updated with complete copies of any and all medical records or test results by ALL authorized physicians providing medical or other care to Mr. Bloom; if such is not done soon after any and all doctors office visits, surgeries or diagnostic testing, your client's entitlement to provision of cure will be severely prejudiced.

As Mr. Langan correctly pointed out in his April 18, 2002 facsimile correspondence to you, your recitation of Florida Statutes in this Federal Admiralty, Jones Act case, for a maritime accident occurring off Norfolk, Virginia is legally and factually inapplicable, due to the existence of the Federal Supremacy Clause under which conflicting state law is

Exhibit F.

Mr. Curry Pajcic
re: Bloom v. Weeks Marine
April 19, 2002
Page 2

preempted by prevailing Federal law.  Under the Federal laws at issue, my client Weeks
Marine, Inc.  has an unquestioned right, and in fact duty and obligation, to monitor Mr.
Bloom's medical care and treatment, and if such is not done or if a problem arises during
such treatment or care, my client could very well be held vicariously liable.  Mr. Langan
provided you with several examples of this potential liability in his facsimile letter to you
yesterday.

In fact, you need to be on notice that your continued insistence at my client not complying
with their cure duties and obligations by monitoring Mr. Bloom's medical care does in fact
unnecessarily expose  Weeks Marine, Inc., to civil liability in the event that something
goes wrong with Mr. Bloom's treatment, or care.  If that eventuality arises, your
intransigent  position on the medical monitoring issue will inevitably drag your office into
any claim, or litigation, and we are herein putting you on notice of our position.  Please
be advised that, to date, no direct verbal communication between Weeks Marine, Inc.  and
Mr. Bloom's physicians have taken place, and we are not insisting in the least that we are
entitled to same outside of the presence of yourself or Mr. Bloom; instead, we are simply
asserting that we are entitled to write those doctors, in letters that you are carbon copied
on, asking for explanations as to the need for care or treatment, that we be allowed to
monitor his care and treatment, and that we be continually updated by those doctors
following office visits or medical procedures.

For the time being and until such time as the Rule 26 order is issued by the court,
however, I have instructed Weeks Marine, Inc. that its representatives should not
correspond with any of Mr. Bloom's treating physicians or health care providers except
for purposes of authorization, and billing.  Again, this is pursuant to your mandate.

Secondly, on the issue of your April 18, 2002 facsimile correspondence enclosing a
prescription from Dr. Lancaster for referrals to Dr. Bruce Yergin, a pulmonologist, and
Dr. Douglas Fechtel, a general surgeon, we have been provided no explanation by Dr.
Lancaster of a need for both a pulmonologist and general surgeon to consult on the left
pneumothorax.  We had previously authorized a pulmonologist in this case, and had
recommended Dr. Yergin as a potential choice to Rod Sullivan, but to date, no mention
or rationale has been given by Dr. Lancaster for a general surgeon to treat or evaluate the
pneumothorax condition, and certainly no mention of surgery on his lungs has been made
by anyone. Before Weeks Marine, Inc. can be expected to authorize both Dr. Yergin and
Dr. Fechtel, we will need a detailed written explanation from Dr. Lancaster as to the

Mr. Curry Pajcic
re: Bloom v. Weeks Marine
April 19, 2002
Page 3

need for both.  In fact, from now on, if any further medical authorizations are made by Mr. Bloom's treating physicians, the authorized doctor (Dr. Lancaster or otherwise) needs to provide a detailed rationale for same in their office notes; a medical prescription by itself is insufficient, since it provides no such detailed rationale or need for treatment.

Third, with the exception of Dr. Yergin and Dr. Fechtel, my understanding is that all other requested medical authorizations have been approved by Weeks Marine, Inc. Should you be in need of a detailed list of authorized physicians or facilities, please advise, but I will be putting the court on notice of all of the authorizations requested, and either provided to date or taken into consideration awaiting explanation.  With regard to the surgical authorizations for Mr. Bloom's shoulder and knee on May 2, 2002, while same is authorized, Weeks Marine, Inc. reserves the right to have Mr. Bloom evaluated prior to surgery with regard to the need for surgery.

Fourth, on the issue of maintenance for Mr. Bloom, your client has still not complied with his responsibilities under Admiralty or maritime law by both providing Weeks Marine, Inc. with documentary or other proof supporting his maintenance claim, <u>and</u> by cooperating and assisting with the investigation into this accident by, among other things, furnishing my client with a statement about this accident.  Simply stated, the existence of a collective bargaining agreement clause calling for a specified monetary amount in either daily or weekly maintenance has nothing to do with, and does not obviate your client's <u>obligation</u> under maritime law , to produce proof of the need for maintenance. As a result of your client's  non-cooperation, my client has no obligation under the law to provide maintenance to your client, and until your client provides proof supporting his maintenance claim and cooperates with my client's  investigation by furnishing such statement, Weeks Marine, Inc. will be unable to provide Mr. Bloom with maintenance.

I do believe that I have addressed all pending issues or disputes, but to the extent I may have inadvertently omitted something, please do not hesitate to contact the undersigned regarding same.  I remain

Very truly yours,

Donovan A. Roper

cc: Tom Langan, Weeks Marine, Inc.
    Teresa Olivo, Weeks Marine, Inc.

05/13/02  03:20  FAX                                                                  ☒02

# Roberts Disability Consultants

**Rehabilitation Counseling and Social Security Representation**

Member of the National Organization of Social Security Claimants' Representatives
(NOSSCR)

9550 Regency Sq. Blvd., Suite 808
Jacksonville, Florida 32225
Phone 904 722.9901
Fax 904 722.9447

May 13, 2002

Mr. Curry Pajcic, Esquire
1 Independent Dr., Suite 1900
Jacksonville, Fl. 32202

Re:    John J. Bloom
S.S.#: 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

Dear Mr. Pajcic,

In speaking with you the other day, you read to me the definition of maintenance, as it pertains to the above-mentioned case. Please review the options below and choose the one you feel best meets the definition of maintenance and cure.

Mr. Bloom's current living situation is in a home with a mortgage of $1414.00 and currently has a monthly food bill of $500 a month. This is broken down as follows:

**Option 1:**

$47.13 per day for lodging
$16.66 per day for food

**Option 2:**

Currently, taking the situation of an individual with a disability residing in the Jacksonville area the following information was obtained.

$95.00 a day for lodging
$30 a day per diem for food at a corporate rate ($6.00 / breakfast, $12.00 / lunch, $12.00 / dinner).

Exhibit F

05/15/02  03:20  FAX

## Option 3:

The following figures were obtained through the U.S. Dept. of Labor based on the Consumer Expenditure Survey 2000. For a 38 year-old individual the following expenditures apply:

|  | Annual | Daily |
|---|---|---|
| Housing: | $15,111.00 | **$41.51** |
| Shelter: | $8,930.00 | **$24.53** |

Food:

| Food at home: | $3,484.00 | $9.57 |
|---|---|---|
| Food away from home: | $2,607.00 | $7.16 |
| Total: | $6,091.00 | **$16.73** |

If you should have any questions, please call me at (904) 722-8901.

Sincerely,

John B. Roberts, M.H.S.
Social Security Representative
Certified Disability Management Specialist
Certified Case Manager
Certified Senior Disability Analyst and Diplomat



**WEEKS                    MARINE, INC.**

DREDGING · MARINE CONTRACTORS
STEVEDORING · EQUIPMENT RENTALS
TOWING · HEAVY LIFT · SALVAGE

4 COMMERCE DRIVE, CRANFORD, NEW JERSEY 07016-3598   (908) 272-4010   FAX  (908) 272-4740

8 February 2002

United States Coast Guard
MSO Hampton Roads
Investigations
Norfolk Federal Building
200 Granby Street
Norfolk, VA 23510-1888

Re:     Submittal USCG Forms 2692
        Tug Katherine
        Official Number 614220

Pursuant to United States Coast Guard regulations, Weeks Marine hereby encloses Form 2692
for a incident that occurred on 7 February 2002 in the Norfolk Harbor Reach.

If you require any additional information please do not hesitate to call.  Thank you.

Very truly yours,

Samuel Posner
Crew Manager/Towing Division

cc:     T. Langan

Exhibit G



# FAX   TRANSMISSION

### WEEKS MARINE, INC.
4 Commerce Drive
Cranford, NJ 07016-2497
Phone: (908) 272-4010    Fax: (908) 272-9161

TO:        USCG MSO Hampton Roads,
ATTN.:     Investigations
FAX #:     757-441-3279
PAGES:     04    (including cover sheet)
FROM:      Sam Posner
DATE:      8 February 2002
RE:        Tug Katherine (Official No. 614220)

-------------------------------------------------------------------------------

COMMENTS:

Enclosed please find a copy of the cover letter and 2692 that are being mailed to you today.
These are for any injury occurring in the Norfolk Harbor Reach on 7 February 2002 on
board the tug Katherine.  If you have any questions please feel free to contact the
undersigned.

Sam Posner
Crew Manager/Towing Division

Approved OMB No 2115-003

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-2692 (Rev 6-87) | REPORT OF MARINE ACCIDENT, INJURY OR DEATH | RCS No. G-MMI 2115-003 |
|---|---|---|
| | | UNIT CASE NUMBER |

## SECTION I GENERAL INFORMATION

| 1 Name of Vessel or Facility KATHERINE | 2 Official No 614220 | 3 Nationality USA | 4 Call Sign WAK 5373 | 5 USCG Certificate of inspection Issued at   N/A |
|---|---|---|---|---|
| 6 Type (Towing, Freight, Fish, Drill, etc ) TOWING | 7 Length 99 1' | 8 Gross Tons 147 | 9 Year Built 1979 | 10 Propulsion (Steam, diesel, gas, turbine..) DIESEL |

| 11 Hull Material (Steel, Wood .) STEEL | 12. Draft (ft. - in.) FWD 13' | AFT 15' | 13 If Vessel Classified, By Whom (ABS, LLOYDS, DNV, BV, etc ) N/A | 14. Date (of occurrence) 7 FEBRUARY 2002 | 15 TIME (local) 1330 |
|---|---|---|---|---|---|

| 16. Location (See instruction No. 10A) Norfolk Harbor Reach ov Crany Island   36° 55 3N   76° 20.5W | 17. Estimated Loss or Damage TO |
|---|---|

| 18. Name, Address & Telephone No. Of Operating Company | | |
|---|---|---|
| Weeks Marine, Inc. 4 Commerce Drive Cranford, NJ 07016   (908)272-4010 | VESSEL   $   0 00 |
| | CARGO   $   0 00 |
| | OTHER   $   0 00 |

| 19 Name of Master or Person in Charge RILEY DUPLECHIN | USCG Licence ☒ YES  ☐ NO | 20 Name of Pilot DENNIS CLARK | USCG License ☒ YES  ☐ NO | State License ☐ YES  ☒ NO |
|---|---|---|---|---|

| 19a. Street Address (City, State, Zip Code) 123 PUBLIC ROAD RAYNE, LA 70578 | 19b Telephone Number (318) 334-4618 | 20a Street Address (City, State, Zip Code) 148 PAHL ROAD NICEVILLE FL 32578 | 20b Telephone Number (850) 897-3304 |
|---|---|---|---|

## 21 Casualty Elements (Check as many as needed and explain in Block 44.)

NO. OF PERSONS ON BOARD ____ 5 ____

☐ DEATH-HOW MANY? _____
☐ MISSING-HOW MANY? _____
☒ INJURED-HOW MANY? ____ 1 ____
☐ HAZARDOUS MATERIAL RELEASED OR INVOLVED
  (Identify Substance and amount in Block 44.)
☐ OIL SPILL-ESTIMATE AMOUNT·
  _____
☐ CARGO CONTAINER LOST/DAMAGED
☐ COLLISION (Identify other vessel or object in Block 44.)
☐ GROUNDING   ☐ WAKE DAMAGE

☐ FLOODING, SWAMPING WITHOUT SINKING
☐ CAPSIZING (with or without sinking)
☐ FOUNDERING OR SINKING
☐ HEAVY WEATHER DAMAGE
☐ FIRE
☐ EXPLOSION
☐ COMMERCIAL DIVING CASUALTY
☐ ICE DAMAGE
☐ DAMAGE TO AIDS TO NAVIGATION
☐ STEERING FAILURE
☐ MACHINERY OR EQUIPMENT FAILURE
☐ ELECTRICAL FAILURE
☐ STRUCTURAL FAILURE

☐ FIREFIGHTING OR EMERGENCY EQUIPMENT FAILED OR INADEQUATE (Describe in Block 44.)
☐ LIFESAVING EQUIPMENT FAILED OR INADEQUATE (Describe in Block 44.)
☐ BLOWOUT (Petroleum exploration/production)
☐ ALCOHOL INVOLVEMENT (Describe in Block 44.)
☐ DRUG INVOLVEMENT (Describe in Block 44.)
☐ OTHER (Specify)
_____

## 22 Conditions

A. Sea or River Conditions (wave height, River stage, etc )

| B. WEATHER | C TIME | D. VISIBILITY |
|---|---|---|
| ☐ CLEAR | ☒ DAYLIGHT | ☒ GOOD |
| ☐ RAIN | ☐ TWILIGHT | ☐ FAIR |
| ☐ SNOW | ☐ NIGHT | ☐ POOR |
| ☐ FOG | | |
| ☒ OTHER (Specify) | | |
| CLOUDY | | |

E. DISTANCE (miles) ___ 6-8 ___ (of visibility)
F. AIR TEMPERATURE ___ 40 ___ (F)
G WIND SPEED & DIRECTION ___ 5 ___ W
H. CURRENT SPEED & DIRECTION ___ 4 ___ 11 T

| 23. Navigation Information ☒ MOORED, DOCKED OR FIXED   SPEED & _____ ☐ ANCHORED  ☐ UNDERWAY OR DRIFTING   COURSE _____ | 24 LAST PORT LITTLE CREEK, VA WHERE BOUND TIED TO UNLOADER | 24a Time and Date of Departure N/A |
|---|---|---|

| 25 FOR TOWING ONLY | 25a. NUMBER OF VESSELS TOWED | | | | 25b. TOTAL H.P. OF TOWING UNITS | 25c MAXIMUM SIZE OF TOW WITH TOW-BOAT(S) | | 25d (Describe in Block 44.) |
|---|---|---|---|---|---|---|---|---|
| | | Empty | Loaded | Total | | Length | Width | ☐ PUSHING AHEAD ☐ TOWING ASTERN ☐ TOWING ALONGSIDE ☐ MORE THAN ONE TOW-BOAT IN TOW |

## SECTION II. BARGE INFORMATION

| 26 Name | 26a. Official Number | 26b. Type | 26c Length | 26d. Gross Tons | 26e. USCG Certificate of inspection Issued at |
|---|---|---|---|---|---|

| 26f Year Built | 26g ☐ SINGLE SKIN ☐ DOUBLE SKIN | 26h. Draft FWD   AFT | 26i Operating Company |
|---|---|---|---|

| 26j Damage Amount BARGE $ CARGO $ | 26k. Describe Damage to Barge |
|---|---|

## SECTION III. PERSONNEL ACCIDENT INFORMATION

| 27. Person involved | 27. Name (Last, First, Middle Name) | | 27c. Status |
|---|---|---|---|
| ☒ MALE or ☐ FEMALE<br>☐ DEAD  ☒ INJURED<br>☐ MISSING | BLOOM JOHN J.<br><br>27b. Address (City, State, Zip Code)<br>447B BARNABY AVENUE<br>JACKSONVILLE FL 32217 | | ☒ CREW<br>☐ PASSENGER<br>☐ OTHER (Specify) |

| 28. Birth Date | 29. Telephone No | 30. Job Position | 31. (Check here if off duty) |
|---|---|---|---|
| 14 April 1964 | (904) 737-2925 | DECKHAND - AB | ☐ |

**32. Employer** - (If different from Block 18, fill in Name, Address, Telephone No.)

| 33. Person's Time | YEAR(S) | MONTH(S) | 34. Industry of Employer (Towing, Fishing, Shipping, Crew Supply, Drilling, etc.) |
|---|---|---|---|
| A. IN THIS INDUSTRY - | 5+ | | TOWING/DREDGING |
| B. WITH THIS COMPANY - | 1 | 3 | 35. Was the Injured Person Incapacitated 72 Hours or |
| C. IN PRESENT JOB OR POSITION - | 1 | 3 | More?  ☒ YES  ☐ NO |
| D. ON PRESENT VESSEL/FACILITY - | 1 | 3 | 36. Date of Death |
| E. HOURS ON DUTY WHEN ACCIDENT OCCURRED - | 2 | | N/A |

**37. Activity of Person at Time of Accident**
WORKING ON ANCHOR LIGHT ON MAST ABOVE UPPER HOUSE

**38. Specific Location of Accident on Vessel/Facility**
MAST ABOVE UPPER WHEEL HOUSE

| 39. Type of Accident (Fall, Caught between, etc.) | 40. Resulting Injury (Cut, Bruise, Fracture, Burn, etc.) |
|---|---|
| FALL | BROKEN ARM, FRACTURE LEG, BROKEN RIBS, CONTUSIONS HEAD & FACE |

| 41. Part of Body Injured | 42. Equipment Involved in Accident |
|---|---|
| LEFT LEG, RIBS, RIGHT HARM, HEAD, FACE, BACK | MAST, SAFETY BELT AND LINE, DECK ABOVE WHEEL HOUSE |

**43. Specific Object, Part of Equipment in Block 42, or Substance (Chemical, Solvent, etc.) That directly produced the injury.**
DECK ABOVE WHEEL HOUSE

## SECTION IV. DESCRIPTION OF CASUALTY

**44. Describe how accident occurred, damage, information on alcohol/drug involvement and recommendations for corrective safety measures.** (See instruction and attach additional sheets if necessary).

Mr. Bloom was working on the anchor light, on the mast above the upper wheelhouse, to secure it from falling. He had on a climbing belt. The Captain heard a bang and went to the upper wheel house to see if he needed a hand with the light. Tug was tied to unloader at this time with very little wind and no waves. When the Captain got to the wheel house Mr. Bloom was not there. He looked down and saw that he was lying head down by the wheelhouse. He went down to assist him. A blanket was put over him and the Coast Guard was called for assistance. The rope on his climbing belt was noticed to be broken. Captain remained with Mr. Bloom while the Master took the tug to pier two where a fire truck with a boom and paramedics were on scene. He was taken to Norfolk General Hospital. The emergency room and his doctor were asked in accordance with Federal Regulations to perform drug and alcohol tests. As of this time we have not been notified that these tests were taken.



**45. Witness (Name, Address, Telephone No.)**
DENNIS CLARK,   148 PAHL ROAD, NICEVILLE, FL 32578   (850) 897-3304

**46. Witness (Name, Address, Telephone No.)**
None

## SECTION V. PERSON MAKING THIS REPORT

| 47. Name (PRINT) (Last, First, Middle) | 47b. Address (City, State, Zip Code) | 47c. Title |
|---|---|---|
| Posner, Samuel I. | Weeks Marine, Inc.<br>4 Commerce Drive<br>Cranford, NJ 07016 | Crew Manager/Towing |
| 47a. Signature | | 47d. Telephone No.<br>(908) 272-4010 ext. 166 |
| | | 47e. Date<br>February 8, 2002 |

| FOR COAST GUARD USE ONLY | REPORTING OFFICE: |
|---|---|
| APPARENT CAUSE | |

| | INVESTIGATOR (Name) | DATE | APPROVED BY (Name) | DATE |
|---|---|---|---|---|
| CASUALTY CODE  A  B  C | | | | |





Exhibit H



































# ☰☰BEACHES☰☰
# OPEN MRI

**Patient Name:**  JOHN BLOOM                    **Date of Birth:**  4-14-64
**Date of Exam:**  3-28-02                        **Patient ID #:**  7649
**PAGE 1 OF 2**

**Referring Physician:  Dr. LANCASTER**

## MAGNETIC RESONANCE IMAGING OF THE LUMBAR SPINE WITHOUT CONTRAST

**Clinical Indication:**   Low back pain and bilateral lower extremity radiculopathy.

**TECHNIQUE:**  Multiplanar MRI was performed with sagittal and axial T1 and T2 weighted sequences.

**FINDINGS:**  The conus medullaris is normal in size, position, and signal intensity, ending posterior to T12-L1. There is mild degenerative endplate change at L5-S1 with associated degenerative Schmorl's node formation.  The lumbar vertebral bodies demonstrate otherwise normal marrow signal.

At T12-L1 and L1-2, there is mild disc desiccation with borderline circumferential disc bulges which result in no significant central canal or neural foraminal stenosis.

The L2-3 intervertebral disc is within normal limits.

At L3-4, there is mild disc desiccation with a minimal circumferential disc bulge which results in no significant central canal or neural foraminal stenosis.

The L4-5 intervertebral disc is within normal limits.  Minimal early L4-5 facet joint degenerative change is present.

At L5-S1, there is mild degenerative disc and bilateral facet joint degenerative change with a mild central and left paracentral broad-based disc herniation (protrusion) which result in borderline left lateral recess and left neural foraminal stenosis.  The central canal and right neural foramen are within normal limits.

**Continued . . .**

1560 Roberts Drive • Jacksonville Beach, Florida 32250 • (904) 247-2220 • Fax (904) 247-2296

Exhibit I



**MRI LUMBAR SPINE**
**JOHN BLOOM**

**PAGE 2 OF 2**

**IMPRESSION:**

1. L5-S1 MILD DEGENERATIVE CHANGE AND MILD CENTRAL / LEFT PARACENTRAL DISC BROAD-BASED DISC HERNIATION WHICH RESULT IN BORDERLINE LEFT LATERAL RECESS AND LEFT NEURAL FORAMINAL STENOSIS.

2. L3-4 MINIMAL DISC BULGE WHICH RESULTS IN NO SIGNIFICANT CENTRAL CANAL OR NEURAL FORAMINAL STENOSIS.

ANDREW T. WALKER, MD

ATW/ken 3-28-02

1560 Roberts Drive • Jacksonville Beach, Florida 32250 • (904) 247-2220 • Fax (904) 247-2296

Apr 16 02 10:50a      JOI-BEACHES              904-241-7331           P.4

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

INSTITUTE

BLOOM, JOHN J.          DOB:  04/14/64        CHART# WX204846        Page 8
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
      4/10/2002      STEVEN J. LANCASTER MD                         -CONTINUED-

**PHYSICAL EXAMINATION**
internal/external rotation.  He lacks full extension by
approximately 5-10 degrees.

**X-RAY STUDIES**
Xrays today, AP and lateral of his humerus, shows good
alignment with continued healing and the fracture appears
healed.

**IMPRESSION**
1.   S/P IM rodding right humerus with proximal distal
     interlocking screws.
2.   Minimally displaced fracture, left proximal third
     fibula.
3.   Small anterior compression fracture, T6-T7.
4.   Nondisplaced fracture, left scapular wing.
5.   Right knee, PCL tear.
6.   Right knee, MCL tear.
7.   Right proximal fibula fracture.
8.   R/O right medial meniscal tear.
9.   Old, healed right lateral malleolus fracture.
10.  S/P pneumothorax.
1..  Herniated disk, L5-S1.

**PLAN**
I have recommended to the patient a manipulation of his
right shoulder under anesthesia and an arthroscopy of his
right knee for his continued problems for reasonably and,
most likely, a medial meniscal tear.  He is in agreement
for this and we have scheduled this at JBSC as an
outpatient for 1-hour under general anesthesia for a
right shoulder manipulation and a right knee arthroscopy
with chondroplasty.   The patient understands the
possible risks and complications of the surgery to
include (but not be limited to) neurovascular compromise,
infection, pain, stiffness, instability, arthritis,
thrombophlebitis, weakness, continued problems,
recurrence and death and accepts this.

I have recommended he be seen by Dr. Collier for an
epidural steroid injection for his back and we have set
this up as well.

We will see the patient back postoperatively in one and a
half week's time after surgery for suture removal,
continuation of physical therapy and a check on his
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
BLOOM, JOHN J.          DOB:  04/14/64        CHART # WX204846       Page 8

Exhibit J

PAJCIC & PAJCIC

PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
ONE INDEPENDENT DRIVE, SUITE 1900
JACKSONVILLE, FLORIDA 32202-5013
TELEPHONE (904) 358-8881
TELEFAX (904) 354-1180
E-mail:  attorneys@pajcic.com
Website:  http://www.pajcic.com

WILLIAM S. BURNS, JR.
CHRISTINE A. CLARK
LEE T. GRIFFIN
ROBERT J. LINK
CURRY G. PAJCIC

CURTIS S. PAJCIC
GARY C. PAJCIC
STEPHEN J. PAJCIC, III
RAYMOND P. REID, JR.
THOMAS F. SLATER

April 15, 2002

Donavan Roper, Esq.
Roper & Roper, P.A.
919 West State Road 436, Suite 350
Altamonte Springs, Fl 32714

        Re:  Our Client:      **Jack Bloom**
             Your Client:     **Weeks Marine, Inc.**
             Case No.:        **3:02-CV-176-J-16HTS**
             D/A:             **February 7, 2002**

Dear Donavan:

     Thank you for your letter of April 2, 2002, confirming the
Rule 26 conference that we set for April 24, 2002 here in
Jacksonville.  Until such time, I need to discuss a few issues with
you regarding Mr. Bloom's maintenance and cure.

     First, Mr. Bloom has an appointment scheduled with Dr.
Collier, as referred by Dr. Lancaster, for April 25, 2002 for an
evaluation and lumbar injections.  We need authorization for this
as soon as possible.

     Second, Dr. Lancaster has scheduled surgery for Mr. Bloom on
May 2, 2002, for a shoulder manipulation and a knee scope.  We need
authorization for these as soon as possible.

     Third, Mr. Bloom needs to see his neurologist, Dr. Ben Moore,
for his injuries from the accident.  As you know, Mr. Bloom lost
consciousness when he fell 40 feet from the mast to the deck.
Treatment with a neurologist is reasonable and necessary and has
been recommended by Mr. Bloom's treating physicians from this
accident.  We need authorization for these as soon as possible.

     Fourth, pursuant to **§90.503 F.S.**, Weeks Marine is prohibited
from having contact with Mr. Bloom's medical care providers.  Any
prior authorizations are hereby canceled and null and void.  **The
only contact that Weeks Marine is allowed to have with Mr. Bloom's
medical care providers is** **billing and letters of authorization to
the providers**.  Any and all other requests for medical information,

Exhibit K

PAJCIC & PAJCIC
PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

April 15, 2002
Page 2

*including* requests for records, must come through my office.  Weeks
Marine is prohibited from any other contact.

Finally, pursuant to Judge Moore's Order dated April 9, 2002,
I called your office this morning to discuss the above and the
Emergency Motion filed by previous counsel.  Please call me at your
earliest convenience to discuss the above and the issues addressed
in the Motion for Maintenance and Cure.  The primary and utmost
concern of myself and Mr. Bloom is getting him the timely and
appropriate medical care to which he is entitled by law.

Thank you for you time and attention to the above.  I look
forward to hearing from you soon.

Cordially,

Curry G. Pajcic

cc: Jack Bloom

PAJCIC & PAJCIC
PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
ONE INDEPENDENT DRIVE, SUITE 1900
JACKSONVILLE, FLORIDA 32202-5013
TELEPHONE (904) 358-8881
TELEFAX (904) 354-1180
E-mail· attorneys@pajcic com
Website. http://www pajcic com

WILLIAM S. BURNS, JR
CHRISTINE A CLARK
LEET GRIFFIN
ROBERT J LINK
CURRY G PAJCIC

CURTIS S. PAJCIC
GARY C PAJCIC
STEPHEN J PAJCIC, III
RAYMOND P REID, JR.
THOMAS F SLATER

April 16, 2002

VIA TELECOPIER (407) 869-4343
Donovan Roper, Esq.
Roper & Roper, P.A.
919 West State Road 436
Suite 350
Altamonte, Springs, FL 32714

Dear Donovan: Don :

Please accept this letter requesting authorization for medical treatment for our client, John J. "Jack" Bloom.  Mr. Bloom needs authorization for evaluation and treatment for epidural steroid injections with Dr. Collier.  In addition, surgery has been scheduled for Mr. Bloom on May 2, 2002 for his right shoulder and right knee arthroscopy with chondroplasty. The injections and the surgical procedures are medically necessary for injuries Mr. Bloom sustained on February 7, 2002.  Please call my assistant Amy to advise when the above are authorized.

I have enclosed the request we received from Dr. Lancaster requesting authorization for the above medical treatment.

If I may provide any additional information with regard to the above, please don't hesitate to call me.  Thank you for your attention to this matter.

Very truly yours,

Curry G. Pajcic

CGP:alm

cc: T.B. Olivo, Weeks Marine

F:\users\AMY\W Comp\Bloom\Letters\Roper  2 letter 4.16.02.wpd

Exhibit L

JACKSONVILLE ORTHOPAEDIC INSTITUTE

BLOOM, JOHN J.         DOB:  04/14/64        CHART# WX204846        Page 11
-------------------------------------------------------------------------
     4/25/2002        FRANK R. COLLIER JR MD                  -CONTINUED-
SOCIAL HISTORY

The patient does not smoke or drink.  He is married and
has two sons.


PHYSICAL EXAMINATION

GENERAL:  The patient is a well developed, well
nourished, 38 year old in moderate discomfort.

REFLEXES:  Reflexes in bilateral lower extremities
2+ patellar, 2+ Achilles tendon and 2+ posterior tibialis
bilaterally with plantar responses bilaterally.

SENSORY:  In both lower extremities demonstrates some
paraesthesias in the L5 dermatome on the left side.
Straight leg testing is mildly positive on the left
compared to right side.  Patrick's testing is negative.

MUSCULOSKELETAL:  Lumbar mobility is mildly limited
especially with forward flexion.

PULSES AND SKIN:  Grossly intact throughout.


X-RAY STUDIES

No x-rays were taken today.


IMPRESSION

1.  38 year old right hand dominant male with L5-S1
lumbar disc disruption with left lateralization.
2.  Concomitant left L5 radicular pain syndrome and
discogenic back pain.


PLAN

The patient is to undergo left L5 transforaminal epidural
injection for pain management.  He is presently involved
in a therapy program and is recommended to continue back
stabilization exercises and his present medications.  He
is to follow-up in one month after completion of 2
-------------------------------------------------------------------------
BLOOM, JOHN J.         DOB:   04/14/64        CHART # WX204846        Page 11

Exhibit M

JACKSONVILLE ORTHOPAEDIC INSTITUTE


BLOOM, JOHN J.              DOB:  04/14/64        CHART# WX204846        Page 12
----------------------------------------------------------------------------
            4/25/2002          FRANK R. COLLIER JR MD              -CONTINUED-
         PLAN
         injections.
         FRCjr/TJL

         cc:  Steven Lancaster, M.D.

## BENJAMIN E. MOORE, M.

DIPLOMATE OF AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

Electroencephalography
Electromyography
Telephone (904) 387-6116

DePaul Professional Building
1801 Barrs St., Suite 805
Jacksonville, Florida 32204

May 30, 2002

Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013
Attn: Amy
**VIA FACSIMILE (904)421-3816**

Re: John J. Bloom

Dear Amy,

As per our phone conversation today I am sending this letter regarding Mr. John Bloom to notify you that he is
scheduled to come back to see Dr. Moore for a scheduled follow-up visit on 06/04/02 to be re-evaluated for his
controlled seizure disorder and multiple injuries after an accident he sustained on 02/07/02 while working. He
was initially seen by Dr. Moore on 04/15/02 at which time he was taking Dilantin 200mg twice daily to help
control his seizure disorder. He had a Dilantin level checked on 04/17/02 which was 5.4. He was instructed to
increase his Dilantin to 200mg in the morning and 300mg at bedtime due to his low level. He also had a nerve
conduction study done in our office on 04/17/02 which was within normal limits. Dr. Moore reviewed MRI of
the lumbar spine done on 03/28/02 with the patient which showed L5-S1 radiculopathy. The patient was asked to
follow-up with Dr. S. Lancaster regarding right shoulder/knee pain and decrease range of motion. He is to
return in three months for further evaluation.

The patient had called our office on 04/23/02 complaining of occasional dizziness. He was instructed to have a
CAT scan of the brain done which was completed on 04/30/02 and showed no acute abnormality.

The patient had called our office to schedule an earlier follow-up appointment with Dr. Moore to discuss his
Dilantin therapy and a possible neuro psychiatric evaluation referral. He is scheduled to come in to see Dr.
Moore next week for this appointment on 06/04/02 at 2:45pm.

Due to Dr. Moore's absence from the office today I am forwarding this summary to you per your request.
If you have any questions regarding this update, please call our office at (904)387-6116.

Sincerely,

Julie Goodman
Office Manager/Secretary

jg

Exhibit N

# ROPER & ROPER, P.A.

## ATTORNEYS AT LAW

**919 West State Road 436, Suite 350**
**Altamonte Springs, FL 32714**

Donovan A. Roper, Esquire
Teresa S. Roper, Esquire
Dennise Hernandez Gruber, Esquire
_____
Christopher W. Hardee, Paralegal
G. Lynne Page, Paralegal

Telephone : (407) 774-2444
Facsimile :  (407) 869-4343
E-Mail: droperpa@juno.com

May 7, 2002

via. Facsimile & U.S. Mail

Curry Pajcic, Esquire
Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013

RE:  Bloom v. Weeks Marine

Dear Mr. Pajcic:

While, as I understand from our telephone conversation with regard to the above referenced matter on May 6, 2002, it appears that approval of Dr. Fechtel is no longer an issue since my client has promptly approved him, I have nevertheless been asked to respond to your unjustified correspondence of April 30, 2002 to the undersigned.  I too called your office on several occasions late last week, only to find out that you were out of the office through the weekend.

First of all, my client has never refused, obstructed or delayed medical care for Mr. Bloom; instead, they have merely asked for a reasonable explanation by the referring doctor, Dr. Lancaster, as to why a general surgeon and a pulmonologist were required under the circumstances, when only a pulmonologist was initially recommended by Dr. Lancaster shortly after Mr. Bloom returned to Jacksonville from Virginia.  As you are aware, my client is under an obligation, pursuant to the Jones Act and Admiralty law, to insure that your client receives reasonable, necessary, and appropriate medical care, and if the primary physicians explain, at the time of referral, what the medical basis for that referral is, there certainly is no delay in authorizing same, assuming that a rational, reasonable and medically necessary basis exists for same.

Exhibit O

Curry Pajcic, Esquire
May 7, 2002
Page 2

I personally requested, on April 19, 2002, an explanation as to why Dr. Lancaster was referring Mr. Bloom to both a general surgeon and a pulmonologist, and we were only very recently furnished with an informative or detailed response thereto. Again, when the initial referral for a pulmonologist was made when attorney Rod Sullivan was representing Mr. Bloom, Weeks Marine, Inc. immediately approved the North Florida Chest Physicians. Again though, Dr. Lancaster never made a request or referral at that time for a general surgeon. Therefore, we have a rational and reasonable basis to request an explanation for the most recent request for a general surgeon. Again though, that appears to be a moot issue since approval has since been furnished for Dr. Fechtel to evaluate Mr. Bloom.

Secondly, in all admiralty cases, Weeks Marine, Inc. makes it a practice to call the treating physician with any questions it has with respect to treatment, consultations or recommended procedures. In this case, however, both attorney Sullivan and your office have strictly prohibited us from doing that; the end result, therefore, is a delay necessitated by your prohibitions, which require us to go through your office, and possibly a consulting physician, all of which result in probable delays. Again, you cannot have your cake and eat it too.

Third, with regard to the deferral of authorization for epidural injections, the primary reason for deferral of authorization was because they constitute invasive procedures, and again no explanation was given by Dr. Lancaster for same. Moreover, even as late as April 10, 2002, Dr. Lancaster's physical examination report reflected no objective findings, other than some limited range of motion due to subjective pain complaints, and no radicular complaints, with which to thereafter substantiate epidural injections. Again, under the circumstances, we feel that it is reasonable to request that the referring doctor give an explanation for same at the time of referral. By doing so, the doctor not only protects his patient and himself, but my client protects themselves by fulfilling their obligations under admiralty law!

Fourth, your April 30 correspondence assumes something which my client and the undersigned did not know to be the case, and that is whether Dr. Collier is, or has been, a partner of Dr. Lancaster. We had no idea they were partners! Both

Curry Pajcic, Esquire
May 7, 2002
Page 3


doctors in fact have different mailing addresses, and Dr. Collier is not listed on the Jacksonville Orthopedic Institute web site as one of their physicians. Notwithstanding that fact, as in any other invasive medical procedure, my client simply needs a brief but informative explanation as to the need for the referral–that certainly is not much to ask, especially when it is my client who is paying your client's medical bills!

Lastly, even though you carbon copied Teresa Olivo at Weeks Marine on same, I have forwarded your May 1, 2002 facsimile and certified mail correspondence onto Ms. Olivo, and asked that she consider, and process, those reimbursement and payment requests.

Please do not hesitate to contact me to discuss any of the above, or any other issues involving medical authorizations in this case, should you feel the need to do so.  I remain

Very truly yours,

DONOVAN A. ROPER

DAR:ddc

cc:   Teresa Olivo, Weeks Marine, Inc.

# ROPER & ROPER, P.A.

### ATTORNEYS AT LAW

**919 West State Road 436, Suite 350**
**Altamonte Springs, FL 32714**

Donovan A. Roper, Esquire
Teresa S. Roper, Esquire
Dennise Hernandez Gruber, Esquire
———————————
Christopher W. Hardee, Paralegal
G. Lynne Page, Paralegal

Telephone : (407) 774-2444
Facsimile :  (407) 869-4343
E-Mail: droperpa@juno.com

May 7, 2002

via. Facsimile & U.S. Mail

Curry Pajcic, Esquire
Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013

RE:   Bloom v. Weeks Marine

Dear Mr. Pajcic:

While, as I understand from our telephone conversation with regard to the above referenced matter on May 6, 2002, it appears that approval of Dr. Fechtel is no longer an issue since my client has promptly approved him, I have nevertheless been asked to respond to your unjustified correspondence of April 30, 2002 to the undersigned.  I too called your office on several occasions late last week, only to find out that you were out of the office through the weekend.

First of all, my client has never refused, obstructed or delayed medical care for Mr.  Bloom; instead, they have merely asked for a reasonable explanation by the referring doctor, Dr. Lancaster, as to why a general surgeon and a pulmonologist were required under the circumstances, when only a pulmonologist was initially recommended by Dr. Lancaster shortly after Mr. Bloom returned to Jacksonville from Virginia.  As you are aware, my client is under an obligation, pursuant to the Jones Act and Admiralty law, to insure that your client receives reasonable, necessary, and appropriate medical care, and if the primary physicians explain, at the time of referral, what the medical basis for that referral is, there certainly is no delay in authorizing same, assuming that a rational, reasonable and medically necessary basis exists for same.

Exhibit P

Curry Pajcic, Esquire
May 7, 2002
Page 2

I personally requested, on April 19, 2002, an explanation as to why Dr.
Lancaster was referring Mr. Bloom to both a general surgeon and a pulmonologist,
and we were only very recently furnished with an informative or detailed response
thereto.  Again, when the initial referral for a pulmonologist was made when
attorney Rod Sullivan was representing Mr. Bloom, Weeks Marine, Inc.
immediately approved the North Florida Chest Physicians.  Again though, Dr.
Lancaster never made a request or referral at that time for a general surgeon.
Therefore, we have a rational and reasonable basis to request an explanation for the
most recent request for a general surgeon.  Again though, that appears to be a moot
issue since approval has since been furnished for Dr. Fechtel to evaluate Mr.
Bloom.

Secondly, in all admiralty cases, Weeks Marine, Inc. makes it a practice to
call  the treating physician with any questions it has with respect to treatment,
consultations or recommended procedures.  In this case, however, both attorney
Sullivan and your office have strictly prohibited us from doing that; the end result,
therefore, is a delay necessitated by your prohibitions, which require us to go
through your office, and possibly a consulting physician, all of which result in
probable delays.  Again, you cannot have your cake and eat it too.

Third, with regard to the deferral of authorization for epidural injections, the
primary reason for deferral of authorization was because they constitute invasive
procedures, and again no explanation was given by Dr. Lancaster for same.
Moreover, even as late as April 10, 2002, Dr. Lancaster's physical examination
report reflected no objective findings, other than some limited range of motion due
to subjective pain complaints, and no radicular complaints, with which to thereafter
substantiate epidural injections.  Again, under the circumstances, we feel that it is
reasonable to request that the referring doctor  give an explanation for same at the
time of referral.  By doing so, the doctor not only protects his patient and himself,
but my client protects themselves by fulfilling their obligations under admiralty law!

Fourth, your April 30 correspondence assumes something which my client
and the undersigned did not know to be the case, and that is whether Dr. Collier is,
or has been, a partner of Dr. Lancaster.  We had no idea they were partners!  Both

Curry Pajcic, Esquire
May 7, 2002
Page 3

doctors in fact have different mailing addresses, and Dr. Collier is not listed on the Jacksonville Orthopedic Institute web site as one of their physicians. Notwithstanding that fact, as in any other invasive medical procedure, my client simply needs a brief but informative explanation as to the need for the referral–that certainly is not much to ask, especially when it is my client who is paying your client's medical bills!

Lastly, even though you carbon copied Teresa Olivo at Weeks Marine on same, I have forwarded your May 1, 2002 facsimile and certified mail correspondence onto Ms. Olivo, and asked that she consider, and process, those reimbursement and payment requests.

Please do not hesitate to contact me to discuss any of the above, or any other issues involving medical authorizations in this case, should you feel the need to do so. I remain

Very truly yours,

DONOVAN A. ROPER

DAR:ddc

cc:   Teresa Olivo, Weeks Marine, Inc.

PAJCIC & PAJCIC
PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
ONE INDEPENDENT DRIVE, SUITE 1900
JACKSONVILLE, FLORIDA 32202-5013
TELEPHONE (904) 358-8881
TELEFAX (904) 354-1180
E-mail: attorneys@pajcic.com
Website: http://www.pajcic.com

WILLIAM S. BURNS, JR
CHRISTINE A. CLARK
LEE T. GRIFFIN
ROBERT J. LINK
CURRY G. PAJCIC

CURTIS S. PAJCIC
GARY C. PAJCIC
STEPHEN J. PAJCIC, III
RAYMOND P. REID, JR
THOMAS F. SLATER

May 22, 2002

Donovan Roper, Esquire
Roper & Roper, P.A.
919 West State Road 436
Suite 350
Altamonte Springs, FL 32714

Re:  John J. Bloom v. Weeks Marine, Inc.

Dear Don:

Thank you for your phone calls of May 17, 2002 and your time discussing the case. Confirming our conversations, you are in the process of obtaining the insurance policy and the color copies from Weeks Marine and will provide them to me shortly. Additionally, we set the deposition of Mr. Bloom for June 10, 2002 at 10:00 a.m. in my offices.

Next, regarding the request for approval of the injections as prescribed by Dr. Lancaster and Dr. Collier, Weeks Marine is still refusing to approve the prescribed injections. Weeks is continuing to refuse these prescriptions despite the fact that Dr. Lancaster has clearly approved and prescribed the injections and Dr. Collier clearly agrees with the need for injections. This is in addition to the fact that the need for the injections is clearly the herniated disc in Mr. Bloom's lower back which was caused by the accident. Nonetheless, Weeks is now insisting upon a letter from Dr. Collier as well explaining the need for the prescriptions. This is unreasonable delay or reasonable and necessary medical care for Mr. Bloom.

Weeks Marine has and continues to receive all documents it needs to approve the reasonable and necessary medical care of Mr. Bloom. Responding to Weeks Marine's letter of earlier this month regarding whether Weeks Marine should be allowed to infringe upon Mr. Bloom's patient client privilege of confidentiality, Weeks Marine has been and continues to receive everything it needs in order to provide reasonable and necessary medical care. In fact, before my offices got involved in the case, and before Mr. Bloom was aware that Weeks was communicating with his doctors in

Exhibit Q

PAJCIC & PAJCIC
PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

May 22, 2002
Page 2

violation of his doctor-patient confidentiality, Weeks Marine was
even less punctual and forthcoming in providing Mr. Bloom's medical
care.

In your letter of May 7, 2002, you made a reference to
something to the effect that Mr. Sullivan may have instructed Weeks
Marine that Mr. Bloom was asserting his patient-client
confidentiality privilege. It is my understanding that no such
assertion was made while Mr. Bloom was being represented by Mr.
Sullivan and that during that time Weeks did communicate with Mr.
Bloom's doctors in violation of §456.057 and §395.3025, Florida
Statutes. If it is, in fact, true that Mr. Sullivan instructed
Weeks Marine that Mr. Bloom was asserting his patient client
confidentiality privilege, then Weeks Marine continued to violate
that privilege despite the instruction not to until my offices
finally got involved. It is my understanding that no such
privilege claim had been made until April of 2002 in that Weeks
continued to have free reign of contact with Mr. Bloom's doctors
before April of 2002. If this is not correct, please advise.

Thank you for your time and attention to this case. Please do
not hesitate to call me if you need anything further. We look
forward to Weeks Marine's prompt approval of the requested
injections by Dr. Collier. We further look forward to Weeks Marine
finally paying maintenance to Mr. Bloom, as he has still not
received one cent in maintenance.

Very truly yours,

Curry G. Pajcic

CGP:alm

cc:  John J. Bloom
     Theresa Olivo, Weeks Marine

F \users\CURRY\Bloom\Letters\Roper.5-22-02.wpd

# ROPER & ROPER, P.A.

### ATTORNEYS AT LAW

**919 West State Road 436, Suite 350**
**Altamonte Springs, FL 32714**

Donovan A. Roper, Esquire
Teresa S. Roper, Esquire
Dennise Hernandez Gruber, Esq.
_____

Christopher W. Hardee, Paralegal
G. Lynne Page, Paralegal

Telephone : (407) 774-2444
Facsimile :  (407) 869-4343
E-Mail: droperpa@juno.com

May 28, 2002

via. Facsimile & U.S. Mail

Curry Pajcic, Esquire
Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013

            RE:   Bloom v. Weeks Marine

Dear Mr. Pajcic:

        I feel compelled to respond to your May 22, 2002 correspondence to the
undersigned to correct some obvious misunderstandings and/or errors on your part
with regard to written explanations of the need for referrals by Dr. Collier, and to
once again point out that any delays in obtaining authorizations for medical
treatment were brought about by <u>your</u> office's insistence that Weeks Marine, Inc.
have no contact with Mr. Bloom's treating physicians.

        The bottom-line is that, were it not for your mandates, these continued letters
back and forth between our offices would be completely unnecessary, and it would
be a moot point.  You and I certainly have better things to do with our time than
spend it on these repetitious letters back and forth on what is, after all, a simple and
clear-cut issue.

        Notwithstanding that fact, let me again remind you that my client is under an
obligation and duty pursuant to Admiralty law to monitor Mr. Bloom's care, and
assure that he receives  medically reasonable and necessary care in order to achieve
medical cure.  My client has thus far authorized literally thousands of dollars on
behalf of Mr. Bloom in ongoing medical or rehabilitative treatment, surgical
intervention and hospital costs, and it is reasonable and customary in this industry
to request and obtain explanations from treating physicians as to the need for certain
types of referrals, or treatment.  Again, were we able to speak with those physicians

Exhibit R

Curry Pajcic, Esquire
May 28, 2002
Page 2

directly, there would be no delay whatsoever in authorization. Be that as it may, though, the record thus far on requesting a brief written explanation from Dr. Collier long ago as to the reasons, or rationale and necessity of those injections speaks literally volumes, and demonstrates unequivocally that it is Dr. Collier who has failed to respond to our, your, and Weeks Marine, Inc.'s <u>repeated</u> requests for a brief written explanation. If fault lies with anyone's office, it is certainly not on the defense side!

We have already authorized injections by Dr. Lancaster, once he provided the requested written explanation. As soon as Dr. Collier does the same, Weeks will be happy to entertain consideration for authorizing same.

As to the issue of maintenance, Mr. Bloom has still not cooperated <u>one iota</u> with my client's repeated attempts at investigating this accident, by among other things furnishing us with a statement regarding this unwitnessed accident, again because of your office's insistence (as well as his prior attorney Mr. Sullivan's insistence), and thus far he has completely failed to provide requested proof of the need for maintenance. As a result and under these factual circumstances, my client has no obligation under Admiralty law to pay maintenance to Mr. Bloom.

With regard to the issue of the patient-client confidentiality privilege issue, I really don't follow what you're saying in your May 22 correspondence, but obviously there is some misinformation on your end. First of all, Mr. Sullivan cited the wrong statute initially, and secondly my client has never violated any of Mr. Bloom's privileges by contacting the doctors directly, or indirectly, after being instructed not to do so by either Mr. Sullivan or your office. I have no idea where you came up with that erroneous assumption!

I remain

Very truly yours,

DONOVAN A. ROPER

DAR:ddc
cc:   Teresa Olivo, Weeks Marine, Inc.

**P A J C I C  &  P A J C I C**

PROFESSIONAL ASSOCIATION

ATTORNEYS AT LAW

ONE INDEPENDENT DRIVE, SUITE 1900

JACKSONVILLE, FLORIDA 32202-5013

TELEPHONE (904) 358-8881

TELEFAX (904) 354-1180

E-mail  attorneys@pajcic.com

Website   http://www.pajcic.com

WILLIAM S. BURNS, JR.
CHRISTINE A. CLARK
LEE T GRIFFIN
ROBERT J LINK
CURRY G PAJCIC

CURTIS S PAJCIC
GARY C PAJCIC
STEPHEN J. PAJCIC, III
RAYMOND P REID, JR
THOMAS F. SLATER

May 31, 2002

Donovan Roper, Esquire
Roper & Roper, P.A.
919 West State Road 436
Suite 350
Altamonte Springs, FL 32714

      Re:  John J. Bloom v. Weeks Marine, Inc.

Dear Don:

     Thank you for your letter dated May 28, 2002.  Respectfully, we could not disagree more with Weeks' position on each of the issues cited therein.  The delays in medical care started long before and were worse before Mr. Bloom asserted his physician-patient confidentiality privilege.  From Weeks' legal-strategic standpoint, one can see why they would like unfettered access to the doctors of a victim that has filed suit against them for the tremendous damages that Mr. Bloom has suffered because of the unseaworthy condition of Weeks' vessel.

     Regarding the requested injections, Weeks alone is responsible for the delay thereof.  Interestingly, Weeks first asked for a note from Dr. Lancaster explaining the need for the injections which Dr. Collier had requested.  When it was pointed out that Dr. Lancaster had already provided the same, Weeks then changed their position and asked also for a letter from Dr. Collier asking for another explanation of what, we believe a jury will think, is obvious.  Please approve the injections as soon as possible.

     Regarding maintenance, it would be interesting to see what a jury thinks of Weeks Marine's reasons for denying maintenance to Mr. Bloom.  Regarding Mr. Bloom's deposition, the first time Weeks ever requested the same was in early May, and I offered several dates in May and early June.  Weeks Marine chose to take Mr. Bloom's deposition on June 10, 2002, and Mr. Bloom has made himself available for the same.

     Regarding depositions, I would like to take the depositions of Tom Langhan, Theresa Olivo, all of the crew aboard the Katherine at

Exhibit S

PAJCIC & PAJCIC
PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

May 31, 2002
Page 2


the time of the accident, and the corporate representatives of
Weeks with the most knowledge regarding: Weeks' safety, training
and education programs; Weeks' fall protection systems criteria and
practices; Weeks' fall protection training; the safety belt
involved in this accident; and OSHA compliance.

I look forward to hearing from you with dates and times for
the above depositions. Also, please forward the color photos and
insurance policy that we are still waiting on. Thank you for you
time and attention to the above.

Very truly yours,

Curry G. Pajcic


CGP:alm

cc:  John J. Bloom
     Theresa Olivo, Weeks Marine


F:\users\CURRY\Bloom\Letters\Roper.5-31-02 wpd



**Jacksonville Orthopaedic Institute**

Hiram A. Carrasquillo, M.D.
*Foot and Ankle Surgery*
*General Orthopaedic Surgery*

Frank R. Collier, Jr., M.D
*Physical Medicine and Rehabilitation*

Steven M. Crenshaw, M.D.
*General Orthopaedic*
*Adult Reconstructive Surgery*

Philip R. Hardy, M.D
*Adult Reconstructive Surgery*
*General Orthopaedic Surgery*

Howard P. Hogshead, M.D.
*Spinal Disorders*

Gregory C. Keller, M.D.
*Spinal Disorders*
*General Orthopaedic Surgery*

Garry S. Kitay, M.D.
*Hand and Microvascular Surgery*
*Upper Extremity Reconstruction*
*General Orthopaedic Surgery*

R. Stephen Lucie, M.D.
*Sports Medicine*
*General Orthopaedic Surgery*

William G. Pujadas, M.D.
*Adult Reconstructive Surgery*
*General Orthopaedic Surgery*

Michael S. Scharf, M.D., F.A.C.S.
*Spinal Disorders*
*General Orthopaedic Surgery*

Bruce Steinberg, M.D.
*Hand and Microvascular Surgery*
*Upper Extremity Reconstruction*
*General Orthopaedic Surgery*

Carlos R. Taudron, M.D.
*Sports Medicine*
*General Orthopaedic Surgery*

Mary Anne Hudson
*Office Manager*

July 10, 2002

CURRY G PAJCIC
ONE INDEPENDENT DRIVE
SUITE 1000
JACKSONVILLE FL 32202-5013

RE:  John J. Bloom

Dear Mr. Pajcic:

Mr. Bloom has a herniated disc, L5-S1, with left
lateralization impingement of the nerve root on the left
side.  He has concomitant left L5 radiculitis.
Essentially the disc is pressing on the nerve causing
significant discomfort this patient.  It is my medical
assessment that we may be able to avoid surgery and
significantly improve the patient's pain and suffering.
He has been having significant discomfort for quite some
time and spinal injections can afford him excellent
relief of discomfort as well as potentially avoiding
surgical intervention.  It is my medical opinion, within
a reasonable degree of medical certainty, that this
herniated disc is a direct result of his recent injury on
February 7, 2002.  I am asking this to expedite approval
for payment of this procedure to prevent any further
undue suffering and potentially avert a surgical
intervention.

Thank you for you attention to this matter.

Sincerely,

*Frank R Collier, Jr.*

Frank R. Collier, Jr., M.D.

FRCjr:tjl

*Official Sports*
*Medicine Partner*



Exhibit T

1325 San Marco Boulevard, Suite 200, Jacksonville, FL 32207
6-3465   Fax: (904) 396-0388
www.jax-orthopaedic.com

Received Time Jul.10.  4:51PM



**Jacksonville Orthopaedic Institute**

Hiram A. Carrasquillo, M.D.
*Foot and Ankle Surgery*
*General Orthopaedic Surgery*

Frank R. Collier, Jr., M.D.
*Physical Medicine and Rehabilitation*

Steven M. Crenshaw, M.D.
*General Orthopaedic*
*Adult Reconstructive Surgery*

Philip R. Hardy, M.D.
*Adult Reconstructive Surgery*
*General Orthopaedic Surgery*

Howard P. Hogshead, M.D.
*Spinal Disorders*

Gregory C. Keller, M.D.
*Spinal Disorders*
*General Orthopaedic Surgery*

Garry S. Kitay, M.D.
*Hand and Microvascular Surgery*
*Upper Extremity Reconstruction*
*General Orthopaedic Surgery*

R. Stephen Lucie, M.D.
*Sports Medicine*
*General Orthopaedic Surgery*

William G. Pujadas, M.D.
*Adult Reconstructive Surgery*
*General Orthopaedic Surgery*

Michael S. Scharf, M.D., F.A.C.S.
*Spinal Disorders*
*General Orthopaedic Surgery*

Bruce Steinberg, M.D.
*Hand and Microvascular Surgery*
*Upper Extremity Reconstruction*
*General Orthopaedic Surgery*

Carlos R. Tandron, M.D.
*Sports Medicine*
*General Orthopaedic Surgery*

Mary Anne Hudson
*Office Manager*

June 5, 2002

CURRY G PAJCIC
ONE INDEPENDENT DRIVE
SUITE 1000
JACKSONVILLE FL 32202-5013

RE:  John J. Bloom

Dear Mr. Pajcic:

Mr. Bloom is experiencing continued pain and discomfort
with limited mobility.  Injections will offer him
possibly sustained relief of discomfort and improve
overall function.  It may also be helpful in diagnosing
the level of pathology that is causing his sustained
discomfort.  Thank you very much for your consideration.

Sincerely,

Frank R. Collier, Jr., M.D.

FRCjr:tjl

*Official Sports
Medicine Partner*



Exhibit U



Jacksonville
Orthopaedic
Institute

**Hiram A. Carrasquillo, M.D.**
*Foot and Ankle Surgery*
*General Orthopaedic Surgery*

**Frank R. Collier, Jr., M.D.**
*Physical Medicine and Rehabilitation*

**Steven M. Crenshaw, M.D.**
*General Orthopaedic*
*Adult Reconstructive Surgery*

**Philip R. Hardy, M.D.**
*Adult Reconstructive Surgery*
*General Orthopaedic Surgery*

**Howard P. Hogshead, M.D.**
*Spinal Disorders*

**Gregory C. Keller, M.D.**
*Spinal Disorders*
*General Orthopaedic Surgery*

**Garry S. Kitay, M.D.**
*Hand and Microvascular Surgery*
*Upper Extremity Reconstruction*
*General Orthopaedic Surgery*

**R. Stephen Lucie, M.D.**
*Sports Medicine*
*General Orthopaedic Surgery*

**William G. Pujadas, M.D.**
*Adult Reconstructive Surgery*
*General Orthopaedic Surgery*

**Michael S. Scharf, M.D., F.A.C.S.**
*Spinal Disorders*
*General Orthopaedic Surgery*

**Bruce Steinberg, M.D.**
*Hand and Microvascular Surgery*
*Upper Extremity Reconstruction*
*General Orthopaedic Surgery*

**Carlos R. Taudron, M.D.**
*Sports Medicine*
*General Orthopaedic Surgery*

**Mary Anne Hudson**
*Office Manager*

July 10, 2002

CURRY G PAJCIC
ONE INDEPENDENT DRIVE
SUITE 1000
JACKSONVILLE FL 32202-5013

RE:   John J. Bloom

Dear Mr. Pajcic:

Mr. Bloom has a herniated disc, L5-S1, with left
lateralization impingement of the nerve root on the left
side.  He has concomitant left L5 radiculitis.
Essentially the disc is pressing on the nerve causing
significant discomfort this patient.  It is my medical
assessment that we may be able to avoid surgery and
significantly improve the patient's pain and suffering.
He has been having significant discomfort for quite some
time and spinal injections can afford him excellent
relief of discomfort as well as potentially avoiding
surgical intervention.  It is my medical opinion, within
a reasonable degree of medical certainty, that this
herniated disc is a direct result of his recent injury on
February 7, 2002.  I am asking this to expedite approval
for payment of this procedure to prevent any further
undue suffering and potentially avert a surgical
intervention.

Thank you for you attention to this matter.

Sincerely,

*Frank R Collier, Jr H.D.*

Frank R. Collier, Jr., M.D.

FRCjr:tjl

*Official Sports*
*Medicine Partner*



Exhibit V

1325 San Marco Boulevard, Suite 200, Jacksonville, FL 32207
Received Time Jul.10..  4:51PM 6-3465   Fax: (904) 396-0388
www.jax-orthopaedic.com

JACKSONVILLE ORTHOPAEDIC INSTITUTE

BLOOM, JOHN J.          DOB:  04/14/64       CHART# WX204846          Page 4
--------------------------------------------------------------------
       2/25/2002      STEVEN J. LANCASTER MD                    -CONTINUED-
FOLLOW UP VISIT
The patient is seen back today now approximately two and
a half weeks after his surgery on his right humerus for
an IM rod.  He has had his MRI evaluation of his right
knee which shows a full thickness tear of the posterior
cruciate ligament, a tear of the medial collateral
ligament, and a bone bruise of the lateral femoral
condyle with a large joint effusion.  There is some
meniscal capsular separation also.  We have gone over
these findings with him today.

He is still having pain about the arm as well as the knee
but is in the knee immobilizer, has not started any
therapy.  He still has pain medicine at home.  His MRI
also shows a fracture of the right fibula proximally,
subcortical.  There is also a bone bruise.

Past medical history, family history, social history and
review of systems is reviewed and updated in the chart for
completeness.

PHYSICAL EXAMINATION
Physical examination shows the incision line across the
right humerus is clean and dry.  Sutures are removed and
the area is Steri-Stripped.  There are no signs of
infection.

His right knee has no effusion but is developing some
stiffness.  There is a good range of motion of his hip
and ankle otherwise.

IMPRESSION
1.  S/P IM rodding, right humerus, with proximal distal
    interlocking screws.
2.  Minimally displaced fracture, left proximal third
    fibula.
3.  Small anterior compression fracture, T6-T7.
4.  Nondisplaced fracture, left scapular wing.
5.  Right knee, PCL tear.
6.  Right knee, MCL tear.
7.  Right proximal fibula fracture.
8.  R/O right medial meniscal tear.
9.  Old, healed right lateral malleolus fracture.
10. S/P pneumothorax.

--------------------------------------------------------------------
BLOOM, JOHN J.          DOB:  04/14/64       CHART # WX204846          Page 4

Exhibit W

Steven J. Lancaster, M.D.
Patient Records Incomplete
Without Physicians Interpretation

JACKSONVILLE ORTHOPAEDIC INSTITUTE

LOOM, JOHN J.          DOB:  04/14/64       CHART# WX204846        Page 5
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**2/25/2002          STEVEN J. LANCASTER MD**
**PLAN**
I have started the patient in physical therapy at
HealthSouth, Southside location, 3 x week for three weeks
for range of motion exercises of shoulder, elbow and his
right knee. He has pain medicine at home.  I have
discontinued the knee immobilizer and given him a
patellar brace.

He needs followup with a chest surgeon for evaluation and
continued treatment of his pneumothorax and chest tube
placement.  This was set up initially and then workmens
compensation evidently discontinued the appointment.  By
copy of this to workmens compensation, will notify them
that this needs to be followed through with.

We will see him back in two weeks' time as a check on his
knee.  If this is not improved, would plan on an
arthroscopic evaluation.

**WORK STATUS**:  He will be off the job for the next one
month.

SJL/dhz
cc:  Work Comp Carrier

**3/13/2002          STEVEN J. LANCASTER MD**
**FOLLOW UP VISIT**

                              DOI: 2/7/02

The patient is seen back today now approximately six
weeks after his multiple injuries.  He is improving with
motion about his right shoulder and elbow but is still
having some pain and some stiffness.  He is having
predominantly pain in his lumbar spine which is keeping
him awake at night and he cannot twist or turn.  His
right knee is improving but still giving him pain when he
is weightbearing.

Past medical history, family history, social history and
review of systems is reviewed and updated in the chart for
completeness.

**PHYSICAL EXAMINATION**
Physical examination shows the right shoulder with
abduction of 90 degrees, flexion of 90 degrees.  The

Steven J. Lancaster, M.D.
Patient Records Incomplete
Without Physicians Interpretation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

INSTITUTE

BLOOM, JOHN J.          DOB:  04/14/64        CHART# WX204846       Page 8
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
      4/10/2002        STEVEN J. LANCASTER MD                    -CONTINUED-
PHYSICAL EXAMINATION
internal/external rotation.  He lacks full extension by
approximately 5-10 degrees.

X-RAY STUDIES
Xrays today, AP and lateral of his humerus, shows good
alignment with continued healing and the fracture appears
healed.

IMPRESSION
1.  S/P IM rodding right humerus with proximal distal
    interlocking screws.
2.  Minimally displaced fracture, left proximal third
    fibula.
3.  Small anterior compression fracture, T6-T7.
4.  Nondisplaced fracture, left scapular wing.
5.  Right knee, PCL tear.
6.  Right knee, MCL tear.
7.  Right proximal fibula fracture.
8.  R/O right medial meniscal tear.
9.  Old, healed right lateral malleolus fracture.
10. S/P pneumothorax.
1.. Herniated disk, L5-S1.

PLAN
I have recommended to the patient a manipulation of his
right shoulder under anesthesia and an arthroscopy of his
right knee for his continued problems for reasonably and,
most likely, a medial meniscal tear.  He is in agreement
for this and we have scheduled this at JBSC as an
outpatient for 1-hour under general anesthesia for a
right shoulder manipulation and a right knee arthroscopy
with chondroplasty.   The patient understands the
possible risks and complications of the surgery to
include (but not be limited to) neurovascular compromise,
infection, pain, stiffness, instability, arthritis,
thrombophlebitis, weakness, continued problems,
recurrence and death and accepts this.

I have recommended he be seen by Dr. Collier for an
epidural steroid injection for his back and we have set
this up as well.

We will see the patient back postoperatively in one and a
half week's time after surgery for suture removal,
continuation of physical therapy and a check on his
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
BLOOM, JOHN J.          DOB:  04/14/64        CHART # WX204846     Page 8



JACKSONVILLE ORTHOPAEDIC INSTITUTE

BLOOM, JOHN J.          DOB:  04/14/64          CHART# WX204846          Page 9

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

   4/10/2002      **STEVEN J. LANCASTER MD**                        -CONTINUED-
   **PLAN**
   status.  When he returns, will obtain xrays AP and
   lateral of his humerus.   I have continued his therapy
   today 3 x week for another four weeks.

   <u>**WORK STATUS**</u>:  He will be off the job for another one
   month, total temporary disability.

   SJL/dhz
   cc:  Frank Collier MD
        Steve Pajcic Esquire

CELEBREX
(CELECOXIB CAPSULES) 100 mg. 200 mg.

DO NOT SEND COPY
OF NOTES TO W/C

PER DR. LANCASTER/TAMMY

dhz 4|11|02

PHARMACIA   Pfizer

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
BLOOM, JOHN J.          DOB:  04/14/64

Post-It™ brand transmittal memo 7671 # of pages ▶ 2
To _Curry Pajcic_          From _T. Longen_
Co. _____  RE: BLOOM_   Co. _____
Dept. _____             Phone # _____
Fax # _____             Fax # _____

**WEEKS MARINE**

DRE
STEVEDORING - EQUIPMENT RENTALS
TOWING - HEAVY LIFT - SALVAGE

4 COMMERCE DRIVE, CRANFORD, NEW JERSEY 07016-3598   (908) 272-4010   FAX: (908) 272-4740

June 24, 2002

**VIA FACSIMILE (904) 396-3039 & REGULAR MAIL**

JUN 2 4 2002

Bruce M. Yergin, M.D.
3627 University Blvd. South, Suite 300
Jacksonville, FL 32216-7426

PATIENT/CLAIMANT: Bloom, John
EMPLOYER: Weeks Marine Inc.
OUR FILE#: 02-027-991
SSN: 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
DATES OF SERVICE: May 7, 2002

Dear Dr. Yergin:

Thank you for your letter of June 17, 2002, in the captioned case. For the reasons set forth below, I am unable to guarantee payment, in the specific amounts mentioned in your letter, at this time.

First, let me correct the initial premise of your letter. The pulmonary consultation you performed on Mr. Bloom was not done at our request. The pulmonary consultation was requested by Mr. Bloom's primary care physician, Dr. Steven Lancaster. As Mr. Bloom's employer, it was simply our obligation to authorize the consultation.

As you may or may not know, this is a maritime personal injury case . Accordingly, medical care in this matter is governed under the applicable Federal law. Medical provider charges are reviewed, in along with the medical records/reports, under the appropriate Current Procedural Terminology (CPT) code. Consultation evaluations are generally billed under the 99241-99275 codes. Upon receipt of the appropriate invoice and supporting medical records, our outside medical auditing firm conducts a timely review of the charges for reasonableness, accuracy of the assigned CPT code, and acceptability of fees.

Upon receipt of the audit report for the services in question, Weeks Marine will make appropriate payment under Federal law and providse you with an Explanation of Benefits (EOB). We will not be responsible for any charges that exceed the schedule rate or the recommended payment amount in the EOB and it is unlawful for a medical provider to pursue these excess charges against the claimant.

With respect to your review of Mr. Bloom's additional medical records and X-rays, it is the patient's (or his attorney's) responsibility to furnish them to you. I would suggest you contact Mr. Curry Pajcic of Pajcic & Pajcic, with respect to obtaining any additional medical records that you wish to review in conjunction with your consultation.

Exhibit X

Bruce M. Yergin, M.D.
June 24, 2002
Page 2


Should you feel the need to discuss this matter further, please feel free to contact the
undersigned. We look forward to receiving and reviewing your consultation report.

Very truly yours,

Thomas F. Langan
Corporate Risk Manager

cc:   T. Olivo

Steven J. Lancaster, M.D.
Jacksonville Orthopaedic Institute
410 Jacksonville Drive
Jacksonville Beach, FL 32250
**VIA FACSIMILE (904) 241-7331**

Don Roper, Esq.
Roper & Roper
919 West State Road 436, Suite 350
Altamonte Springs, FL 32714
**VIA FACSIMILE (407) 869-4343**

Curry G. Pajcic, Esq.
Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013
**VIA FACSIMILE (904) 354-1180**

Post-It™ bran   ; transmittal memo 7671 | # of pages ▸ 2

To Curry Pajcic   From T. Langer

Co.   Co.

RE : Bloom

Dept.   Phone #

Fax #   Fax #

## WEEKS MARINE

DRE
STEVEDORING - EQUIPMENT RENTALS
TOWING - HEAVY LIFT - SALVAGE

4 COMMERCE DRIVE, CRANFORD, NEW JERSEY 07016-3598   (908) 272-4010   FAX: (908) 272-4740

June 24, 2002

**VIA FACSIMILE (904) 396-3039 & REGULAR MAIL**

JUN 2 4 2002

Bruce M. Yergin, M.D.
3627 University Blvd. South, Suite 300
Jacksonville, FL 32216-7426

> PATIENT/CLAIMANT: Bloom, John
> EMPLOYER: Weeks Marine Inc.
> OUR FILE#: 02-027-991
> SSN: 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
> DATES OF SERVICE: May 7, 2002

Dear Dr. Yergin:

Thank you for your letter of June 17, 2002, in the captioned case. For the reasons set forth below, I am unable to guarantee payment, in the specific amounts mentioned in your letter, at this time.

First, let me correct the initial premise of your letter. The pulmonary consultation you performed on Mr. Bloom was not done at our request. The pulmonary consultation was requested by Mr. Bloom's primary care physician, Dr. Steven Lancaster. As Mr. Bloom's employer, it was simply our obligation to authorize the consultation.

As you may or may not know, this is a maritime personal injury case . Accordingly, medical care in this matter is governed under the applicable Federal law. Medical provider charges are reviewed, in along with the medical records/reports, under the appropriate Current Procedural Terminology (CPT) code. Consultation evaluations are generally billed under the 99241-99275 codes. Upon receipt of the appropriate invoice and supporting medical records, our outside medical auditing firm conducts a timely review of the charges for reasonableness, accuracy of the assigned CPT code, and acceptability of fees.

Upon receipt of the audit report for the services in question, Weeks Marine will make appropriate payment under Federal law and providse you with an Explanation of Benefits (EOB). We will not be responsible for any charges that exceed the schedule rate or the recommended payment amount in the EOB and it is unlawful for a medical provider to pursue these excess charges against the claimant.

With respect to your review of Mr. Bloom's additional medical records and X-rays, it is the patient's (or his attorney's) responsibility to furnish them to you. I would suggest you contact Mr. Curry Pajcic of Pajcic & Pajcic, with respect to obtaining any additional medical records that you wish to review in conjunction with your consultation.

Exhibit Y

Bruce M. Yergin, M.D.
June 24, 2002
Page 2


Should you feel the need to discuss this matter further, please feel free to contact the undersigned. We look forward to receiving and reviewing your consultation report.

Very truly yours,

Thomas F. Langan
Corporate Risk Manager

cc:   T. Olivo

Steven J. Lancaster, M.D.
Jacksonville Orthopaedic Institute
410 Jacksonville Drive
Jacksonville Beach, FL 32250
**VIA FACSIMILE (904) 241-7331**

Don Roper, Esq.
Roper & Roper
919 West State Road 436, Suite 350
Altamonte Springs, FL 32714
**VIA FACSIMILE (407) 869-4343**

Curry G. Pajcic, Esq.
Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013
**VIA FACSIMILE (904) 354-1180**

FROM : JOI BEACHES                    FAX NO. :904 241 7331            Apr. 16 2002 04:57PM  P3



**WEEKS**      **MARINE, INC.**

DREDGING · MARINE CONTRACTORS
STEVEDORING · EQUIPMENT RENTALS
TOWING · HEAVY LIFT · SALVAGE

4 COMMERCE DRIVE, CRANFORD, NEW JERSEY 07016-3598   (908) 272-4010   FAX: (908) 272-4740

April 11, 2002

<u>**VIA FACSIMILE (904) 387-6118 & REGULAR MAIL**</u>

Benjamin Moore, M.D.
ATTN: Julie
1801 Barrs Street, Suite 805
Jacksonville, FL 32204

RE: **BLOOM, John**
D/A: February 7, 2002
Our File No.: 02-027-991

Dear Dr. Moore:

This letter is in response to a telephone inquiry from your office seeking authorization to treat our employee, Mr. John J. Bloom, in connection with work-related injuries. You have not been granted authorization to treat the captioned employee in connection with his work related injury at this time, since there has been no referral from the authorized primary care physician. Primary authorization to treat Mr. Bloom has already been given to another physician, chosen by the employee, and no request for a change of physician has been granted.

No approval was given for a consult or "second opinion" examination and there is no evidence of record which would indicate that failure to obtain pre-approval was the result of an emergency. Any treatment which you may provide on your own, without written authorization from this office, should not be billed to this self-insured employer.

Weeks Marine, Inc. will be more than happy to authorize any reasonable and necessary medical care, provided the treatment is requested/recommended by the primary care physician and properly preauthorized. Please do not hesitate to call us should you have any questions.

I regret a more favorable reply is not in order at this time

Sincerely,

Thomas P. Langan
Corporate Risk Manager

Exhibit 2

**WEEKS MARII**

Post-It™ brand fax transmittal memo 7671 | # of pages ▸ 4

To C Pajcic | From T. Langan
Co. | Co. Weeks
Dept. | Phone #
Fax # | Fax #

4 COMMERCE DRIVE, CRANFORD, NEW

April 17, 2002

## VIA FACSIMILE (904) 387-6118 & REGULAR MAIL

Benjamin Moore, M.D.
1801 Barrs Street, Suite 805
Jacksonville, FL 32204

RE: **BLOOM, John**
D/A: February 7, 2002
Our File No.: 02-027-991

Dear Dr. Moore:

This is to confirm our authorization of a neurological consultation for the captioned claimant. This consultation was recommended by the recognized treating physician, Dr. Steven J. Lancaster. This authorization is limited as set forth below.

The initial hospital report from Sentara Norfolk General Hospital, where Mr. Bloom was treated immediately following his injury, reports that he sustained a fall greater than 30 feet, no amnesia, no loss of consciousness. As a result of the fall Mr. Bloom sustained a traumatic pneumothorax, multiple fractures (right humerus, left fibula, three ribs, scapula) and some contusions and sprains. Although we have no direct report of the event from Mr. Bloom, this history was apparently taken from Mr. Bloom and pre-hospital services. (see attached).

Although you are authorized to conduct a complete neurological consultation, this self-insured employer will only take responsibility for neurological sequelae that is causally related to the reported fall. It is our understanding that you have previously treated Mr. Bloom and should be aware of his medical history. In addition, your examination should be performed in conjunction with a thorough review of Mr. Bloom's hospital treatment records, surgical reports, and diagnostic films, which the patient should bring with him to the examination or be sent directly to you by his attorney.

It is understood that the consultation will be done as soon as practically possible. A complete consultation report must be furnished to Dr. Lancaster and this office within ten (10) days after it has taken place. Separate authorization must be obtained for any additional treatment/testing beyond this initial authorized consultation.

Any specialized diagnostic testing (other than routine X-rays and lab tests), further outside referrals/consultations, purchases of medical equipment or other medical services falling outside the normal consultation regimen, requires pre-authorization in writing, except in an emergency.

Exhibit AA

Benjamin Moore, M.D.
April 17, 2002
Page 2

Please include the claim number shown above on all correspondence. Invoices must reflect appropriate Physicians' Current Procedural Terminology (CPT) codes. Charges may not exceed reasonable and customary charges in the geographical area provided.

No authorization is granted other than specifically set forth herein. If you have any questions, please feel free to contact this office anytime.

Thank you for agreeing to provide our employee with these necessary medical services.

Very truly yours,

Thomas F. Langan
Corporate Risk Manager

Enclosure

cc:    T.B. Olivo

Steven J. Lancaster, M.D.
Jacksonville Orthopaedic Institute
410 Jacksonville Drive
Jacksonville Beach, FL 32250
**VIA FACSIMILE (904) 241-7331**

Don Roper, Esq.
Roper & Roper
919 West State Road 436, Suite 350
Altamonte Springs, FL 32714
**VIA FACSIMILE (407) 869-4343**

Curry G. Pajcic, Esq.
Pajcic & Pajcic
One Independent Drive, Suite 1900
Jacksonville, FL 32202-5013
**VIA FACSIMILE (904) 354-1180**

JACKSONVILLE ORTHOPAEDIC INSTITUTE

JUN 1 2 2002

BLOOM, JOHN J.          DOB:  04/14/64       CHART# WX204846          Page 14
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
      6/03/2002       STEVEN J. LANCASTER MD
**FOLLOW UP VISIT**
                                    DOS:  05/02/02

The patient is seen back today now approximately one
month after his right knee arthroscopy and is continuing
to improve in physical therapy for his right shoulder as
well as his knee.  His original injury was 02/07/02.  He
has been seen by Dr. Yergin from a pulmonary standpoint
but was not seen by the cardiovascular surgeon nor the
general surgeon.  At this point, I have discussed with
him that as long as he was seen by Dr. Yergin, a
pulmonologist, that his pneumothorax would have been
considered followed up.  He is still working in therapy.
He has taken very little pain medicine.

Past medical history, family history, social history and
review of systems is reviewed and updated in the chart for
completeness.

**PHYSICAL EXAMINATION**
Physical examination shows a good range of motion about
the right knee, still with some pain on stooping and
squatting.

His right shoulder has improved motion now with abduction
of 120 degrees, forward flexion of 160 degrees.

**X-RAY STUDIES**
Xrays today AP and lateral of his right humerus show good
positioning of implants with the fracture line fading but
still present.

**IMPRESSION**
1.  S/P right knee, partial medial and lateral
    meniscectomy with chondroplasty.
2.  S/P IM rodding, right humerus with proximal and
    distal interlocking screws.
3.  Adhesive capsulitis, right shoulder; S/P
    manipulation.
4.  Minimally displaced fracture left proximal third,
    fibula.
5.  Small anterior compression fracture, T6-7.
6.  Nondisplaced fracture, left scapular wing.
7.  Right proximal fibular fracture.
8.  Old healed right lateral malleolus fracture.
9.  S/P pneumothorax.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
BLOOM, JOHN J.          DOB:  04/14/64       CHART # WX204846          Page 14

Exhibit BB

## JACKSONVILLE ORTHOPAEDIC INSTITUTE

BLOOM, JOHN J.          DOB:  04/14/64          CHART# WX204846          Page 15
--------------------------------------------------------------------------------
        6/03/2002          STEVEN J. LANCASTER MD                    -CONTINUED-
**IMPRESSION**
10. Herniated disk, L5-S1.

**PLAN**
I have extended his physical therapy for both his knee as
well as his shoulder 3 x week for another four weeks.

We will see the patient back in one month's time as a
check on the above.  We will obtain xrays of his humerus
AP and lateral when he returns.

SJL/dhz
cc: Curry Pajcic Esquire

**ADDENDUM**
I would like to add that I would recommend a referral to
Dr. Benjamin Moore protesting a treatment of memory loss,
headaches, dizziness and to check a Dilantin level all
stemming from his closed head injury.

In addition I would concur with recommendations made by
Dr. Collier in his 04/25/02 report for epidural steroid
injections.

SJL/dhz
cc:  Curry Pajcic Esquire


        6/05/2002          FRANK R. COLLIER JR MD
**MISCELLANEOUS LETTER**
(Msc) PAJCIC, CURRY G.

--------------------------------------------------------------------------------

PAJCIC & PAJCIC
PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
ONE INDEPENDENT DRIVE, SUITE 1900
JACKSONVILLE, FLORIDA 32202-5013
TELEPHONE (904) 358-8881
TELEFAX (904) 354-1180
E-mail:  attorneys@pajcic.com
Website:  http://www.pajcic.com

WILLIAM S. BURNS, JR.                                                                                    CURTIS S. PAJCIC
CHRISTINE A. CLARK                                                                                       GARY C. PAJCIC
LEE T. GRIFFIN                                          May 1, 2002                                      STEPHEN J. PAJCIC, III
ROBERT J. LINK                                                                                           RAYMOND P. REID, JR.
CURRY G. PAJCIC                                                                                          THOMAS F. SLATER

**VIA TELECOPIER (407) 869-4343 & CERTIFIED MAIL**
Donovan Roper, Esquire
Roper & Roper, PA
919 West State Route 436, Ste. 3504 Commerce Drive
Altamote Springs, FL 32714

     Re:  John J. Bloom v. Weeks Marine, Inc.

Dear Mr. Roper:

     Enclosed please find invoices for services rendered to Mr. Bloom as a result of this accident on February 7, 2002.  The bills are as follows:

1.   Vann-Virginia Center for Orthopaedics          $3,239.00

2.   3 nights at Sentara Guest Center for Dawn Bloom   $   60.00

3.   Medical treatment provided by Dr. Benjamin Moore   $  600.00

4.   Emergency transport by Norfolk Fire & Paramedic   $  370.75

      TOTAL DUE AND OWING          $4,269.25

     Also for your reference, I am sending copies of airline tickets that were purchased for Mrs. Bloom's trip from Jacksonville to Norfolk, Virginia and the return ticket for Jack to return to Jacksonville after his release from the hospital.  After Dawn had purchased the tickets, Mr. & Mrs. Bloom were informed by his doctor that due to the punctured lung, Jack would not be able to fly. They have incurred expenses for the round trip drive from Jacksonville to Norfolk, Virginia, fuel and an overnight stay at a Ramada Inn on the trip back.  Please forward payment directly to the above named facilities and copy my office with the remittance.

Exhibit CC

PAJCIC & PAJCIC
PROFESSIONAL ASSOCIATION.
ATTORNEYS AT LAW

May 1, 2002
Page 2

        If you have any questions with regard to the above or any
other aspect of this file, please don't hesitate to contact me.
Thank you in advance for your attention to this matter.

                                    Very truly yours,


                                    Curry G. Pajcic


CGP:alm
enclosures

cc:  Jack Bloom
     Theresa Olivo, Weeks Marine, Inc.

**CERTIFIED MAIL**

  RE: Bloom - Bills letter
  Curry / Amy
  7109 8372 7250 0160 4062


THERESA OLIVO
WEEKS MARINE, INC.
4 COMMERCE DRIVE
CRANFORD NJ 07016-3598


**CERTIFIED MAIL**

  RE: Bloom - Bills letter
  Curry / Amy
  7109 8372 7250 0160 4055


DONOVAN ROPER, ESQUIRE
ROPER & ROPER, PA
919 WEST STATE ROUTE 436
SUITE 350
ALTAMONTE SPRINGS FL 32714